# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH *vs.* JOHN J. HINDS.

Middlesex. September 7, 2007. - October 26, 2007.

Present: MARSHALL, C.J., GREANEY, COWIN, CORDY, & BOTSFORD, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Assistance of counsel. *Evidence,* Expert opinion. *Witness,* Expert. *Constitutional Law,* Assistance of counsel. *Malice. Mental Impairment.*

At a murder trial where the defendant's entire defense centered on demonstrating mental impairment negating his capacity to intend to kill, the judge erred in instructing the jury to disregard the testimony of the defendant's expert witness, a psychiatrist, unless the testimony was based on facts that the Commonwealth had proved beyond a reasonable doubt [11-12]; as a result, serious prejudice inured to the defendant and created a substantial likelihood of a miscarriage of justice warranting a new trial [13-15].

INDICTMENTS found and returned in the Superior Court Department on November 12, 1998.

The cases were tried before *Margaret R. Hinkle,* J.

*Myles D. Jacobson* for the defendant.

*Adrienne C. Lynch*, Assistant District Attorney (*Marguerite T. Grant*, Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. The defendant was convicted by a jury on two indictments charging murder in the first degree (on the theory of deliberate premeditation) and on an indictment charging assault with intent to murder while armed with a dangerous weapon.[1] He is represented by new counsel on appeal. The principal issues are whether an important part of the trial judge's instruction on how the jury should evaluate expert testimony was erroneous, and, if so, whether the faulty instruction so undercut the defendant's case (which was based on, among other evidence, expert testimony of a psychiatrist) that a new trial is required. We answer these questions affirmatively. Accordingly, the judgments of conviction will be reversed and the jury verdicts set aside.

There is no dispute that, on the morning of October 16, 1998, the defendant shot and wounded his sister, Patricia Hinds Melo (Patty), and then shot and killed his half brother, Joseph Warren Beranger (Warren[2]), and Warren's wife, Mary. The only contested issue at trial was whether the Commonwealth had proved, beyond a reasonable doubt, that the defendant possessed the requisite state of mind prior to, and at the time of, the shootings to support convictions for the crimes of murder in the first degree and assault with intent to murder. We now briefly summarize the evidence supporting the parties' positions on that issue.

1. a. The Commonwealth's evidence permitted the jury to find the following. In 1998, the Hinds family consisted of Mary Stella Hinds (Mrs. Hinds) and her six children: Warren; Walter E. Hinds, Jr. (Wally); Charles T. Hinds (Charlie); the defendant; James R. Hinds (James); and Patty. Warren, the oldest, was Mrs. Hinds's son from a previous relationship. Patty, the young-

---

[1]The jury also convicted the defendant on indictments charging assault and battery with a dangerous weapon (this conviction was placed on file with the defendant's consent) and unlawful possession of a firearm, on which he received a concurrent sentence. These convictions play no part in this appeal.

[2]Warren is referred to in the record as Warren, Joseph, or (by the defendant) as simply Joe. For simplicity, we will use the name Warren.

est, had been adopted when the defendant was a teenager. The family grew up in a two-family house located at 157½ Fifth Street in Cambridge.[3] In 1965, Warren, a career military man in the Air Force, moved to California with his wife Mary and their two children. In 1992, Mrs. Hinds gave Warren a power of attorney, with Patty as an alternate. As of 1998, Mrs. Hinds was eighty-six years of age and living in an apartment on the first floor of the house (which she owned). The defendant, who was fifty-six years of age, had been living in the house with his mother for five years. Charlie lived next door at 207 Charles Street.

Early in 1998, Mrs. Hinds experienced two falls and, after spending several months in rehabilitation hospitals, went to live with Patty in Revere. In June, Warren and Mary traveled east for a family visit, and Patty held a family reunion at her home. It was the first time in twenty years that the family was together, and Charlie was the only sibling not in attendance. The reunion went smoothly, and everyone had a good time.

In the fall of 1998, Warren and Mary again visited from California. They discussed with Patty the idea of selling the house at 157½ Fifth Street in order to obtain help for Mrs. Hinds, who needed considerable care at the time. On October 3, Warren, Mary, Patty, and Mrs. Hinds went to 157½ Fifth Street to retrieve certain things that Mrs. Hinds needed. Because they had no key, Warren tried to pick the locks, but, in the end, they were unable to gain entrance to the house. That evening, Warren sent an electronic message to the defendant, expressing his intention to put his mother's house up for sale in one week and stating that, if the defendant refused to give him the keys to the house, he (Warren) would change the locks.

The next morning, the defendant reported to Officer Louis Neal of the Cambridge police department that Warren had tried to break into the house. Officer Neal advised the defendant to contact a lawyer. A few days later, the defendant went to the Cambridge Division of the District Court Department and obtained a restraining order, pursuant to G. L. c. 209A, forbidding Warren from contacting him or from coming near 157½

---

[3] An alternate address for the house provided in the record is 207 Rear Charles Street.

Fifth Street. A hearing on the restraining order was scheduled in the District Court for the morning of October 16, 1998. Warren, Mary, and Patty attended the hearing. The judge vacated the restraining order, and the defendant stormed out of the court room.

On leaving the court house, Warren, Mary, and Patty proceeded to Fifth Street. Warren made two telephone calls to the Cambridge police requesting an escort to go into his mother's home. After a short time, when no police officers had yet arrived, Patty walked toward the house to get her mother. Warren and Mary waited at the corner of Fifth and Hurley Streets.

The defendant met Patty at the back door and asked her what she wanted. When Patty answered that she wanted to talk to her mother, the defendant stated, "She don't want to talk to you. Ma, do you want to talk to Patty?" Patty then heard a little voice inside say "yes." She entered the house. As Patty began to inform her mother about the recent events, the defendant said suddenly, "How about this? Take this." He took his hand out of his pocket and shot her in the head. Patty collapsed on the floor, and, when she tried to get up, the defendant said, "Stay down or I'll shoot you again." He then went outside.

At about 10:45 A.M. on that day, Kevin Christie was delivering a package to a neighbor's house on Fifth Street. Christie noticed the defendant walk by and then heard several shots. As he turned, he saw the defendant with his hand outstretched and another man fall to the ground. Christie yelled to the defendant, "Hey, I didn't see nothing." The defendant replied, "That's all right." Christie said, "Those assholes probably deserved it anyways, huh?" The defendant commented, "They're gonna fry my ass," to which Christie replied, "Nah, self-defense." The defendant said, "Yea, right," and walked toward his mother's house.

At 10:53 A.M., the defendant made a 911 emergency telephone call,[4] in which he stated, "I just killed my brother and sister-in-law and I shot my sister." When the dispatcher asked the defendant if any victims were injured, he responded, "I hope they're dead," and then added, "I wish I could have killed you, Patty." He told the dispatcher that he would wait outside for the

---

[4] A neighbor also made a 911 telephone call at 10:52 A.M.

police to come. Police officers arriving shortly after 10:55 A.M. found Mary lying face down in the gutter, her closed pocketbook at her side. Warren lay a foot away, still breathing, face up on the sidewalk. The defendant came out of his mother's house, put his hands behind his back, and stated, "I did it." After receiving, and waiving, Miranda warnings, the defendant told police that he had believed Warren was armed because Warren had his hand in his pocket, and, when Warren would not take his hand out of his pocket, the defendant shot him. When asked about Mary, the defendant explained that he was afraid she had a gun as well, because she had put her hand inside her pocketbook. When she did not take her hand out, the defendant shot her. Asked about Patty, the defendant said that she had yelled at him, so he shot her in the head.

Patty was taken to the hospital, where she was treated for two gunshot wounds to the head. She recovered and was a primary witness for the Commonwealth at trial. Mary died at the scene from two gunshot wounds to the face. Warren was taken to the hospital but died seven days later of gunshot wounds to his head and back.

b. The defendant's evidence, designed to rebut the Commonwealth's proof, and to negate the state of mind requirements of the crimes with which he was charged because of mental impairment, was as follows. The relationship between Warren and the defendant had never been a good one. Even as a young child, the defendant had always been afraid of Warren. When Warren was home, he argued with his mother and father (then alive) and fought with his brothers. James and the defendant would go upstairs to their room or leave the house. Charlie testified that, as children, "when Warren came into the room, we walked out." As an adult, the defendant spoke to Charlie and to James of his fear of Warren. Warren was known to wear a black pouch (a so-called "fanny pack") around his waist and once told James, in the presence of the defendant, "I don't fight anymore. I let my metal, my package take care of that." The defendant knew that Warren owned at least one gun.

From 1992 until the time of his mother's hospitalizations, the defendant lived with his mother in her house, maintaining her property and taking care of her basic daily needs. In April,

1998, the defendant underwent emergency coronary bypass surgery. Because it was clear that the defendant would not, at that time, be able to care for his mother as he had done, an arrangement was made for Mrs. Hinds to stay with Patty in Revere on her release from the rehabilitation hospital. In June, 1998, the defendant was living alone at 157½ Fifth Street, when Warren, Mary, their daughter, Cathy, and their grandson arrived at the house for an unannounced visit. Leaving Warren in the basement to search for a horn he had once left, the defendant came upstairs to find Mary and Cathy removing small items ("knick-knacks") from his mother's cabinets. The defendant asked them to put everything back, telling them "[t]his is not my house, it's my mother's house." The next time the defendant saw Warren and Mary was at the family reunion at Patty's house.

According to the defendant, the reunion was not the happy occasion portrayed by the Commonwealth. Charlie refused to attend because Warren would be there.[5] James (who, in 1988, Warren had evicted, with his wife and two young children, from the second floor apartment of his mother's house) was not planning to attend, because he "was afraid what would happen if there was any problems." The defendant asked James to go as "somebody that he could be with and he knew real good," however, and James agreed to meet the defendant there. On James' arrival, Warren immediately began harassing him about his weight. Warren told James, "I might be old but I can take you," and, later, tapped him on the stomach and said, "the offer's still on."

The defendant had very little interaction with Warren that day. Their sole conversation was a discussion about past surgeries. The defendant pointed out that the material of the shirt he was wearing felt rough against the incision line from his recent open heart surgery. Warren leaned over, grabbed the shirt with his fist, and dug the material up and down very hard against the defendant's chest. The defendant said, "What's wrong with you . . . it's all red and raw." He then got up, said, "That's it, I'm out of here," and left the party.

---

[5]Warren once demanded $3,800 from Charlie for his mother's share in property once owned by Charlie and his father. Charlie gave the money to Warren because he was afraid of him.

On October 3, 1998, Charlie observed Warren, Mary, Patty, and Mrs. Hinds in the front yard of his mother's house. From a window of his house, Charlie used a video camera to record Warren as he picked the lock of the outside door of 157½ Fifth Street. As he was leaving, Warren (apparently to let Charlie know that he was aware of his presence) "gave [him] the finger." Charlie made a telephone call to the defendant (who was not at home at the time) to tell him what had happened. Although Charlie urged the defendant to return immediately, the defendant refused, saying that he would not go to that house with Warren there. The defendant testified that he was afraid of Warren and "didn't know what he was after or what he wanted to do to me."

That evening, Warren repeated to the defendant during a telephone call what he had stated in the electronic message: he wanted the keys to the house and he intended to sell it. The defendant and Warren then began arguing over a cable the defendant had once left in Warren's garage in California. Warren threatened the defendant with physical harm and cursed at him, telling the defendant, "I'm gonna beat you on your fucking chest until you're dead." The defendant hung up. He described himself feeling "crazy, I guess. I remember my heart was pounding. I had a headache."

The defendant returned to his mother's house the following morning and reported to the police that his half-brother from California had tried to break into the house. When Officer Neal arrived to take his report, the defendant told him that he was in fear for his life and was afraid of Warren. A few days later, the defendant obtained the restraining order against Warren.

On the morning of October 16, 1998, the defendant went to the court house to attend the hearing on the restraining order. Getting off the elevator on the thirteenth floor, the defendant was shocked to see Warren sitting on a bench outside the court room. He got back in the elevator and "pushed as many buttons as [he] could to get the door to close." The defendant walked around for awhile on another floor before returning to the thirteenth floor. After the judge vacated the order, the defendant walked out of the court room and down a stairway, because he was afraid that he would get stuck on the elevator with Warren.

Disoriented and not knowing exactly what had happened, the defendant returned to his mother's house. He told his mother that the judge would not give him a restraining order so now they had no protection. He stated, "They can come in and get you, they can come in and kill me if they want." He testified that he was "really in fear"; he "thought they were going to come"; he "knew they were going to come and get us"; "they were going to take my mother against her will"; and "she didn't want to go." The defendant further testified that he had no idea what Warren would do to him and that he had wanted to go hide someplace, but felt that he "had to stay because my mother was there and she was unprotected."

The defendant went to his automobile, parked in front of the house, to look for cigarettes. To his right, the defendant saw Warren and Mary at the corner. He grabbed a handgun from the trunk, put it in a briefcase, closed the trunk and ran with the briefcase through the front outside door of the house. As he ran through the house, he called to his mother, "Ma, they're here, they're here to get us." Through the window, the defendant could see Patty outside, running to the back door. The defendant tried to close the door, but Patty hit it and knocked the defendant back on the steps. Patty entered the kitchen and stood "nose to nose" with her mother.

Patty screamed at her mother; accused her of starting the family conflict; told her that she was going to die; and threatened to put her in a nursing home. The defendant tried to get Patty to stop. Patty responded, "If it weren't for you, this would be taken care of now." The defendant testified that his mother's hand was on her chest and she was trying to breathe. He stated, "I had the gun in my hand and I fired." He then told his mother that he would protect her with his life and that he was going to try to "talk some sense" into Mary and Warren. The defendant stated, "this is foolish, it can't go any further."

Confronting Warren and Mary on the corner, the defendant asked them why they were "fucking Ma and I around like this? Why don't you just leave us alone and go away?" Mary bent down and put her hands on her pocketbook as though she were going to open it. The defendant twice told her to take her hands away and the gun, still in the defendant's hand, "went off." The

defendant then turned to Warren, who had pushed his coat back. Believing that Warren had a handgun in his back pocket, the defendant told him to take his hands away. When he did not, the defendant "fired the gun again." The defendant then went back into the house. He testified that he made the 911 telephone call because he thought "that was the right thing to do."

c. The centerpiece of the defense at trial was that the defendant did not possess the requisite ability to premeditate deliberately with malice aforethought necessary to be convicted of the charged offenses. Defense counsel argued to the jury that the defendant suffered from "acute anxiety" at the time of the shootings, caused by ongoing intimidation by Warren, who had threatened and frightened the defendant for decades. This state of mind, defense counsel argued, interfered with the defendant's mental processes to the point that he was rendered incapable of forming a specific intent to shoot Patty. When Patty threatened his mother, the defendant's anxiety, already at an unbearable point because of his extreme fear and confusion over the events of the day, heightened even more, and he shot her. From there, still in a reactive, distressed state, and incapable of forming an intent to kill, the defendant went outside and shot Warren and Mary. When he discharged his gun, the defendant testified that he was "scared, petrified," and that "I didn't want to hurt anybody. I just wanted people to leave us alone, where everybody was happy." Nor, according to the defendant, did he intend to murder Patty. He testified, "I got along fine with Patty."

The Commonwealth portrayed the defendant as a self-centered, self-absorbed person, who attempted to kill Patty, and did kill Warren and Mary, as part of a deliberate and premeditated plan to gain control of his mother's house and to get rid of Warren's influence over his life. The prosecution told the jury: "He knew he had choices to make and he made those choices freely. He acted on his free will, with full knowledge of what he was doing. No one is suggesting to you that [the defendant's] choices were the right ones, that they were correct and reasonable in the circumstances. But what [I am] suggesting to you is that everything [the defendant] did on October 16, 1998, demonstrated free will and an ability to understand the situation he was in and act accordingly."

d. The defendant's position was supported by the evidence set forth above and by expert testimony by a psychiatrist, Dr. Bernard Yudowitz. The Commonwealth rebutted Dr. Yudowitz's testimony with the expert testimony of its psychiatrist, Dr. Martin Kelly. We next summarize the expert testimony.

(i) Dr. Yudowitz testified that, in his opinion, as the events leading up to the shootings unfolded, the defendant was so anxious, fearful, and nervous, that he was not capable of delibera-tive thought. Dr. Yudowitz pointed out that the defendant had a "hundred different reasons" for being afraid of Warren. Unexpected events, such as his failure to get a restraining order, Warren showing up at the house, the threatened sale of his mother's house, as well as his vulnerability from recently hav-ing undergone open heart surgery, led to the defendant's "overwhelming fear and anxiety." According to Dr. Yudowitz, assuming all the facts in the defendant's case (as carefully restated to him by defense counsel in a lengthy hypothetical question), and considering his psychiatric evaluation of the defendant, his examination of the defendant's medical records, the tape of the defendant's 911 telephone call to the police, the videotape of the defendant taken at his booking at the police station, police reports, the testimony of witnesses in the grand jury proceedings, and his examination of the transcript of testi-mony up to that point in the trial, it was his definite opinion that the defendant did not premeditate the acts in question.

(ii) Dr. Kelly disagreed. He opined that the defendant had no mental disease, defect, or condition that affected him in any substantial way. According to Dr. Kelly, the defendant did have the capacity to premeditate deliberately his acts on October 16. Dr. Kelly testified that, in his opinion, the defendant was not in fear that day, but planned his behavior deliberately and specifi-cally intended to kill Patty, Warren, and Mary. Even assuming the defendant's own version of events, however, Dr. Kelly told the jury, there is nothing that would have disrupted his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Dr. Kelly stated: "[H]e understood the circumstances. He didn't like them, so he had an emotional response to them, but it did not deprive him of any relevant mental ability."

2. With the contentions at trial presented in the manner set forth *supra*, the judge instructed the jury on the evaluation of expert testimony as follows (the challenged language is emphasized):

"We permit certain witnesses who have specialized training, education, and experience, or who have attained a level of expertise in a particular field or profession, to give opinions in certain instances, and to testify to matters about which that person is knowledgeable if those matters are relevant to the case.

"Now, if those opinion witnesses, sometimes called . . . 'expert witnesses,' *if those witnesses' assumptions involved disputed factual questions, then you must disregard the opinion of those opinion witnesses unless you first find that the fact assumed by that opinion witness in reaching his opinion was proven by the Commonwealth beyond a reasonable doubt.*

"I instruct you further in evaluating opinion witnesses, that those witnesses cannot and must not usurp your role as the finders of facts. We permit those witnesses to testify to assist you in providing information to help you better understand the testimony that you hear and that you will have to weigh and consider while you conduct your deliberations. But an expert witness cannot, ladies and gentlemen, determine issues of fact for you. The ultimate issues are for your determination and decision as the deliberating jurors in the case.

"In other words, you may accept entirely, ladies and gentlemen, the testimony of an opinion witness. You may reject that witness's testimony entirely. Or you may give it whatever weight you deem it to be entitled to, be that weight great or small. You may consider the reasons that the opinion witness, also known as an expert witness, gave for his opinion. And you may consider whether or not you find those reasons to be sound."

The judge's instruction may have derived from comments about an instruction on expert witness opinion in *Commonwealth v. Ward*, 14 Mass. App. Ct. 37, 43-44 (1982). The comments in

*Ward* do not suggest, or approve, the instruction at issue in this case, nor do they suggest, or approve, any particular instruction pertaining to the evaluation of testimony by an expert who testifies on behalf of the defendant. *Ward*, therefore, has no application to the correct way to instruct on expert testimony. The instruction here, as conceded by the Commonwealth, was erroneous. The instruction misstated that the facts on which the expert forms an opinion (a) must be proved (b) by the Commonwealth (c) beyond a reasonable doubt.

There is an alternate instruction on the jury's use of expert testimony (drafted after the trial), which we cited with approval in *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 561 (2002), set forth in the margin,[6] but this instruction also may have its problems owing to its repeated use of the word "true." That word, and the concept it expresses, is capable of different definitions and could cause jurors to speculate with respect to the standard of proof by which they determine that facts are "true." A better instruction is set forth in the margin.[7]

---

[6] Section 4.7.1. of the Massachusetts Superior Court Criminal Practice Jury Instructions (Mass. Continuing Legal Educ. 1999) provides this proposed model instruction:

> "This witness offered you an opinion that was based on certain assumed facts. It is permissible for a witness to testify in that form because it is your responsibility — and not the witness's — to determine from all the evidence what the facts are.
>
> "Such an opinion is of no use to you unless the facts that the witness has been asked to assume, and on which his or her opinion is based, are in fact true.
>
> "If you determine that one or more significant facts the witness was asked to base his or her opinion on are not true, then his or her opinion is not relevant to the facts of this case, and you should not consider his or her opinion in your deliberations.
>
> "Where an expert witness testifies to an opinion that is based on certain assumed facts, you may consider that opinion only to the extent you believe the assumed facts are true. As I have told you, you are the sole judges of the truth to the facts in the case. If you believe that one or more significant facts on which the witness was asked to base his or her opinion are not true, then his or her opinion is not relevant to the facts of this case and you should not consider the opinion in your deliberations."

[7] "There is one more point about witnesses to address: expert witnesses. This term refers to witnesses who have specialized training or experience

3. The erroneous instruction was not objected to by the defendant's trial counsel.[8] The defendant's appellate counsel asserts that trial counsel was, therefore, ineffective. In capital cases, we review claims asserting constitutionally ineffective assistance of trial counsel, and claimed errors raised for the first time on appeal, under the same statutory standard, that is, whether there was error during trial (by defense counsel, the prosecutor, or the judge) and, if so, whether the error could have resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). See also *Commonwealth* v. *Novo*, 449 Mass. 84, 96 (2007); *Commonwealth* v. *Allison*, 434 Mass. 670, 685 (2001). We conclude

---

in a particular field. Generally, in cases that are tried in our courts, both civil and criminal, witnesses may testify only to facts that are within their own personal knowledge — that is, things that they have personally seen or heard or felt. However, in a variety of cases, issues arise that are beyond the experience of lay persons, and in those types of cases, we allow a person with specialized training or experience, called an expert witness, to testify, and to testify not only to facts, but also to opinions, and the reasons for his or her opinions, on issues that are within the witness's field of expertise and are relevant and material to the case.

"Because a particular witness has specialized training and experience in his or her field does not put that witness on a higher level than any other witness, and you are to treat the so-called expert witness just like you would treat any other witness. In other words, as with any other witness, it is completely up to you to decide whether you accept the testimony of an expert witness, including the opinions that the witness gave. It is also entirely up to you to decide whether you accept the facts relied on by the expert and to decide what conclusions, if any, you draw from the expert's testimony. You are free to reject the testimony and opinion of such a witness, in whole or in part, if you determine that the witness's opinion is not based on sufficient education and experience or that the testimony of the witness was motivated by some bias or interest in the case. You must also, as has been explained, keep firmly in mind that you alone decide what the facts are. If you conclude that an expert's opinion is not based on the facts, as you find those facts to be, then you may reject the testimony and opinion of the expert in whole or in part.

"You must remember that expert witnesses do not decide cases; juries do. In the last analysis, an expert witness is like any other witness, in the sense that you alone make the judgment about how much credibility and weight you give to the expert's testimony, and what conclusions you draw from that testimony."

[8]The lack of objection is not entirely surprising, given the misunderstanding about *Commonwealth* v. *Ward*, 14 Mass. App. Ct. 37, 43-44 (1982), and the fact that the instruction presently in use, see note 6, *supra*, had not yet been added to the Massachusetts Superior Court Criminal Practice Jury Instructions.

that the error in the instruction resulted in serious prejudice to the defendant and, therefore, creates a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Lattimore*, 396 Mass. 446, 453 (1985).

As has been stated, the defendant's entire defense was focused on demonstrating that his mental state was so impaired at the time of the shootings that he did not have the capacity to premeditate or to intend to kill. The opinion testimony of Dr. Yudowitz, a qualified psychiatrist, supported the defendant's position in full. There was no challenge to Dr. Yudowitz's testimony, and it was admitted unconditionally. The import of his testimony to the defendant's case is difficult to overstate. See *Commonwealth* v. *Johnston*, 446 Mass. 555, 560 (2006) (evidence of mental impairment relevant to determination of capacity to form specific intent to kill); *Commonwealth* v. *Johnson*, 435 Mass. 113, 122 (2001) (evidence of mental impairment relevant fact bearing on Commonwealth's proof of premeditation element). The instruction incorrectly indicated to the jury that they should disregard Dr. Yudowitz's testimony unless it was based on facts which *the Commonwealth* had proved beyond a reasonable doubt. The instruction, essentially, eviscerated any value to the defense of Dr. Yudowitz's testimony. We need not search far in Federal, and State, law to find stated versions of the principle that creating "an artificial barrier to the consideration of relevant defense testimony" is not allowed.[9] *Cool* v. *United States*, 409 U.S. 100, 104 (1972). See, e.g., *Washington* v. *Texas*, 388 U.S. 14, 18-19 (1967); *Commonwealth* v. *Cole*, 380 Mass. 30, 43 (1980). The erroneous instruction could only have severely damaged the defendant's case.

There is no reasonable chance that the jury may have realized that the judge misspoke or meant the instruction to apply only to Dr. Kelly's testimony. The judge gave one instruction on

[9]The defendant cites *Commonwealth* v. *LaBriola*, 430 Mass. 569, 570 n.3 (2000), in which we stated that jury instructions that "allow[] the jury to convict the defendant on a burden of proof less than beyond a reasonable doubt . . . necessarily require a new trial." Although the challenged instruction was erroneous and, in the circumstances here, requires a new trial, we do not conclude that every incorrect jury instruction of this nature is so fundamental as to require a new trial. The *LaBriola* decision, which dealt with the structural necessity of a correct instruction on reasonable doubt, is not applicable here.

expert witnesses, and the instruction contained the erroneous part. Moreover, the judge introduced the instruction by referring to both experts by name.

We reject the Commonwealth's various arguments that the defendant's evidence was not credible or that its own case was so substantial that the error could not have affected the jury's verdict. This is a case in which mental impairment was presented as the defendant's only realistic defense, and defense counsel vigorously pursued this defense. Dr. Yudowitz's testimony, if accepted by the jury, combined with the defendant's other evidence, if the jury found the evidence credible, could have led to a favorable result for the defendant on the charged offenses. This is not, therefore, a case, such as *Commonwealth* v. *Koonce*, 418 Mass. 367, 370-371 (1994), in which the instruction, though erroneous, could be said to be of no consequence. We also disagree with the Commonwealth's assertion that Dr. Yudowitz repudiated his direct testimony on cross-examination. Dr. Yudowitz's testimony remained constant in the defendant's favor, and his opinions were not repudiated on cross-examination. The instructions, taken as a whole, including the instruction on mental impairment, did not correct the effect of the erroneous instruction. Nor is this a case where the lack of an objection by the defendant's trial counsel can be justified as a strategic choice such that the defendant should forfeit the challenge his appellate counsel now presses.

4. The judgments of conviction are reversed, the jury verdicts set aside, and the case remanded for a new trial.

*So ordered.*