## COMMONWEALTH *vs.* ANIBAL RODRIQUEZ.

Essex. March 6, 2009. - July 2, 2009.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Homicide. Felony-Murder Rule. Robbery. Joint Enterprise. Evidence,* Joint enterprise, Hearsay, Relevancy and materiality, Intent, Verbal completeness, Impeachment of credibility. *Witness,* Impeachment. *Practice, Criminal,* Capital case.

At the trial of an indictment charging murder in the first degree on a theory of felony-murder, in which the defendant claimed that he agreed only to assist a third party in an unarmed robbery that was not committed with a conscious disregard for human life, the judge did not err in permitting an informant to testify that, a few days before the murder, the third party had solicited the informant to help murder the victim, where the testimony was not offered for its truth, but only to establish that the third party was soliciting others to help him kill the victim by the method that was eventually employed, and where the probative value of the testimony (i.e., in establishing whether the defendant agreed to commit an armed robbery or an unarmed robbery with conscious disregard for human life) outweighed its prejudicial effect [219-221]; further, the judge did not err in permitting the Commonwealth to rehabilitate the informant following his impeachment on cross-examination with a self-contradictory statement [221-222].

INDICTMENT found and returned in the Superior Court Department on December 9, 1998.

The case was tried before *Howard J. Whitehead,* J.

*David M. Skeels,* Committee for Public Counsel Services, for the defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a Superior Court jury of murder in the first degree on the theory of felony-murder.[1,2] The underlying felony was either armed robbery or

---

[1]The judge instructed that the defendant could be convicted only as a joint venturer.

[2]The jury were instructed also on the theories of murder in the first degree

unarmed robbery committed with a conscious disregard for human life.[3] The defendant did not deny that he was present at the murder; rather, he claimed that he agreed only to assist another person, Richard Molina,[4] in an unarmed robbery that was not committed with a conscious disregard for human life, and thus, he could not be convicted of felony-murder. On appeal from his conviction, the defendant claims that the judge erred in two respects: first, by admitting testimony that, a few days before the murder in this case, Molina solicited another person, Miguel Valentin, to commit a murder, with the details of the solicitation at least somewhat similar to the events that took place subsequently with the defendant present; and second, by permitting testimony (under the doctrine of verbal completeness) regarding Valentin's testimony at the earlier trial of Molina. We affirm the conviction, and after examination of the entire record, we decline to exercise our power to reduce the verdict or order a new trial. See G. L. c. 278, § 33E.

*Facts.* We summarize the facts the jury could have found and set forth further details in discussion of the specific issues. The body of the victim, a drug dealer from Lawrence, was found in a van in Methuen on October 20, 1998. He had been strangled and stabbed the previous night. A few days before the murder, Molina and his girl friend spoke to Valentin in front of a rooming house in Lawrence. Valentin, Molina, and Molina's girl friend all lived at the rooming house. Molina offered Valentin an opportunity to earn money or drugs by sitting in the back seat of a car and putting a wire on the driver's neck because Molina wanted "to kill" the person who would be driving the car. Molina said that he would bring the wire and would sit in the front passenger seat with his girl friend in the back seat next to Valentin. Valentin

---

committed with deliberate premeditation and committed with extreme atrocity or cruelty. They returned a verdict of guilty only on the theory of felony-murder.

[3]Armed robbery serves as an underlying felony because it carries a life term. See G. L. c. 265, § 17. Although unarmed robbery also carries a life sentence, see G. L. c. 265, § 19, it may serve as a predicate felony only if it is committed with conscious disregard for human life. See *Commonwealth* v. *Cook*, 419 Mass. 192, 205 (1994), *S.C.*, 447 Mass. 1023 (2006), and *S.C.*, 451 Mass. 1008 (2008).

[4]Molina was tried separately and convicted of murder in the first degree by reason of extreme atrocity or cruelty.

refused the offer, and when Molina asked if he knew anyone else who would do it, Valentin replied, "I don't know." After learning of the murder, Valentin contacted a State police trooper (for whom he had long worked as an informant) and told him of his conversation with Molina.

On October 20, 1998, Methuen police "check[ing] out" the vehicle found the victim's body in the van. In the van there was "considerable . . . blood" in the driver's area with the heaviest concentration of blood on the driver's seat. A bloody fingerprint that matched one of the defendant's fingers was found on the casing of the driver's side mirror. The police discovered a bloody knife handle on the floor of the van between the two front seats. A bloody fingerprint on the knife handle matched the middle finger of Molina's right hand. Molina's bloody partial palm print was also on the steering wheel. An extension cord was located between the driver's seat and the door. In addition, there was a great deal of blood on outer parts of the van, including on the undercarriage.

The investigation eventually led police to the defendant. About one week following the murder, after waiving his Miranda rights, the defendant gave a statement to the police regarding his involvement in the murder. The essence of the statement was that he went with Molina to rob a "guy" named Coco of his money, but was unaware of any plans to kill Coco. According to the defendant's statement, Molina told the defendant that Coco would have "a lot of" money and drugs on him. When the victim parked the van "behind [a] DeMoulas [supermarket]," the defendant grabbed Coco around the neck with his arm, but when Coco pulled out a knife and cut the defendant on his neck, wrist and hand, the defendant let him go. Molina took a package from Coco while the defendant had his arm around Coco's neck. Then Molina pulled out a knife and Molina and Coco started fighting. The defendant got out of the van, saw "a lot of blood," and was scared. The driver's door of the van opened and Coco fell on the ground. Molina drove the van then and may have run over Coco. The defendant heard Coco say, "You're killing me for some money?"

While Coco was bloody and still moving, but no longer speaking, the defendant helped Molina put Coco in the van. Molina

drove the van back to the rooming house, got out of the van, told the defendant to get "rid of" it, and gave the defendant fifty dollars for a taxicab ride. The defendant did as he was told. He drove the van to an unknown location (which was in Methuen), left it there along with red pants that he was wearing (he had other pants on underneath), white gloves, and a shirt, and ran until he saw a house with a light on. There he saw a woman outside and asked her if she could get him a number for a taxicab. She eventually called a taxicab for him. The defendant took the taxicab to the rooming house and paid the driver with a fifty dollar bill.

Police investigation corroborated the details of the defendant's statement. At the DeMoulas supermarket in Lawrence,[5] the police found the "blade portion of a knife" on the ground with human blood on it. Deoxyribonucleic acid (DNA) evidence on the blade matched the victim's DNA. A State police chemist compared the blade with the knife handle that had been found in the van and concluded that "the broken edges of both the knife handle and the knife blade were a perfect match." The police found part of an electrical cord on the pavement in an area near the knife and also located bloodstains on the street and bloody tire impressions. Red pants, white gloves, and a shirt were found in the van. A woman who lived in Methuen near the street where the defendant had discarded the van recalled that a man had come to her home that night seeking a number of a taxicab company. The woman had called a taxicab for the man. The taxicab driver remembered being dispatched to the area and later selected from a photographic array a photograph of the defendant as the person he had picked up that night. According to the driver, the fare was nervous and impatient, had a bloody mark on his neck, and paid with a fifty dollar bill with a bit of blood on it.

The victim had been stabbed five times across his chest, once in his lower right abdomen, and once through the left forearm. Any of the torso wounds could have been fatal, and they all could have been caused by the same single-edged blade. The blade found near the DeMoulas supermarket was thin with a single edge and was consistent with the wounds. The victim had

---

[5]The police had been unaware of this site until the defendant informed them of it.

been strangled by a cord or rope, and this was also potentially fatal. The neck wounds were consistent with the electrical cord found in the van and inconsistent with manual strangulation. The ligature marks on the neck were angled backwards and downwards with "downward and backward type pressure," implying that the victim was strangled from behind. The victim was alive during the stabbings and the strangulation. The medical examiner could not determine whether the stab wounds or the strangulation occurred first, but stated that they occurred "within . . . very close proximity in time." The victim's head also suffered blunt force injury and the victim had been run over by the van. The cause of death was multiple stab wounds, and death occurred in a matter of minutes.

The defendant presented no witnesses. In his opening and closing statements and through cross-examination, he contended that he did not kill the victim or share Molina's intent to do so or know that Molina had a knife. The defendant's theory was that "it was only supposed to be a 'strong-arm' robbery" with his participation limited to "restrain[ing]" the victim while Molina executed the robbery. The defendant also contended that he put only his arm, not a wire, around the victim's neck; that he never showed a conscious disregard for the victim's life; that Molina stabbed the victim and then used the cord to "finish him off"; and that the defendant was cooperative and truthful in his statement to the police and the physical evidence was consistent with that statement. The defendant also argued that Valentin was not to be believed, but made a career of "selling" stories to the police to protect his own drug use and sales.

*Discussion.* The defendant claims that the judge erred by permitting the informant Valentin to testify that Molina solicited him to kill an unknown person by putting a wire around his neck. The defendant timely objected to introduction of the out-of-court statement. The defendant is correct that the statement was not admissible as a statement of a joint venturer because it was not made during the course of the joint venture. Cf. *Commonwealth v. McLaughlin*, 431 Mass. 241, 247-248 (2000). The statement was, however, admissible for a different reason.

The statement was not hearsay. "[H]earsay is an extrajudicial statement offered to prove the truth of the matter asserted,"

*Commonwealth* v. *Keizer*, 377 Mass. 264, 269 n.4 (1979). Molina's statement to Valentin was not offered to prove any fact contained in the out-of-court statement, but only to establish that Molina was soliciting others to help him kill the victim by the method that was eventually employed, i.e., a wire around the victim's neck from behind. See *Commonwealth* v. *Sullivan*, 410 Mass. 521, 526 (1991).

The defendant argues also that Molina's out-of-court statement was not admissible because it was not probative of the defendant's intent. We take the defendant to mean that the statement was not relevant. We conclude, however, that the jury could reasonably infer that Molina's mission was to commit a violent robbery and that, having proposed a plan to one potential coventurer (Valentin) and having been rejected, he made the same proposal to the defendant. If so, the defendant thus agreed to a joint enterprise with Molina that had characteristics similar to the plan Molina broached to Valentin. In other words, the Commonwealth's contention was that Molina presumably said the same thing to the defendant that he had said to Valentin on the issue critical to whether a joint venture had been established: specifically, whether the defendant agreed to commit either an armed robbery or an unarmed robbery with conscious disregard for the risk to human life.

By the defendant's own admission, the event the defendant carried out with Molina was virtually identical to that proposed by Molina to Valentin: the victim would drive; Molina would be in the front passenger seat and rob the victim; and the joint venturer would sit in the rear behind the driver and strangle the victim to facilitate the robbery. These factors, combined with the expert testimony that the marks on the victim's neck were angled backward and downward, with "downward and backward type pressure," and that the neck wounds were consistent with electrical cord found in the van and inconsistent with manual strangulation, render Molina's conversation with Valentin probative. As informed by these other events and factors, the judge could conclude that the Valentin conversation was relevant, and that it was proper for the jury to consider that conversation in determining whether the defendant shared Molina's intent to commit either an armed robbery or an unarmed one with conscious disregard for human life.

Valentin's testimony regarding Molina's out-of-court statement concerned the key question, whether the defendant in fact shared Molina's intent to the extent sufficient to establish a joint venture.

It was within the judge's discretion to conclude that the probative value of the statement outweighed its prejudicial effect. See *Commonwealth* v. *Lewin*, 407 Mass. 629, 631 (1990). The judge gave a careful limiting instruction after Valentin's testimony. He told the jury that, if they concluded that Molina did solicit Valentin, it did not "mean that Mr. Molina then asked this defendant to do it." The judge also instructed that Valentin's statements alone were not enough to convict the defendant, but that the jurors could "consider the fact of the solicitation, along with all the evidence in the case, in determining what the defendant did or did not do."

The defendant contends also that the judge erred in permitting the Commonwealth to rehabilitate Valentin following his impeachment on cross-examination. At the earlier trial of Molina, Valentin initially denied that Molina had asked him to put a wire around a person's neck while in the back seat of a car. However, on the following day, Valentin testified to the conversation as set forth above, i.e., that Molina had so solicited him. In the present trial, Valentin testified on direct examination regarding his entire solicitation by Molina. During cross-examination, defense counsel elicited the fact that Valentin had previously testified, inconsistently with his present testimony, that Molina never asked him to put a wire around the victim's neck.

At a sidebar conference, the prosecutor indicated that, if Valentin were so impeached, he would attempt to rehabilitate him by questioning him about the remainder of his testimony at the Molina trial in which he stated that Molina did in fact ask him to put a wire around the victim's neck. The judge ruled that the prosecutor's proffer of Valentin's complete testimony was admissible pursuant to the doctrine of verbal completeness. Defense counsel objected. On redirect, Valentin stated that at the Molina trial he had initially denied the solicitation out of fear for the safety of his family, but that on the next trial day he provided accurately all of the details of the conversation, and he restated those details.

The judge properly admitted this evidence, although not for the reason stated. The evidence was admissible, not pursuant to

Commonwealth *v.* Rodriquez.

the doctrine of verbal completeness, but rather pursuant to the rules permitting rehabilitation of a witness, see M.S. Brodin & M. Avery, Massachusetts Evidence § 6.23 (8th ed. 2007).[6] When a witness has been impeached, the party calling the witness may introduce evidence to explain or contradict the impeachment evidence. Where a witness has been impeached with a self-contradictory statement, the witness may be permitted on redirect to explain the contradiction. See, e.g., *Commonwealth* v. *Cintron*, 435 Mass. 509, 521 (2001); *Commonwealth* v. *Errington*, 390 Mass. 875, 880 (1984); *Commonwealth* v. *DiLego*, 387 Mass. 394, 399 (1982); *Commonwealth* v. *Dougan*, 377 Mass. 303, 309 (1979). This is true even when the rehabilitating statement is made after the witness has a reason to fabricate. See *Commonwealth* v. *DiLego*, *supra*.

Here, Valentin was impeached during cross-examination with his inconsistent testimony at the prior trial. On redirect, the prosecutor was entitled to elicit from Valentin the reason for his contradictory statement and the substance of his consistent statement. See *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375 (1978) (prosecutor entitled on redirect to explore circumstances of "lies" by witness referred to in cross-examination "and to demonstrate the statements were generally consistent with . . . [witness's] direct testimony").

We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's verdict or to order a new trial.

*Judgment affirmed.*

---

[6]The statement was not admissible as a prior consistent statement, as it was made at a time after Valentin had a motive to fabricate. See *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 567 (2001).