COMMONWEALTH *vs.* VUTHY SENG.

Middlesex. December 10, 2009. - April 12, 2010.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Homicide. Armed Assault with Intent to Murder. Practice, Criminal,* Capital case, Challenge to jurors, Instructions to jury. *Evidence,* Prior consistent statement, Past recollection recorded.

At a criminal trial, the judge's adoption of an unconventional individual voir dire procedure did not prejudice the defendant or raise a substantial likelihood of a miscarriage of justice, where Rule 6 of the Rules of the Superior Court did not apply to the procedure, and where the procedure was not tarnished by any error, defect, or irregularity. [493-496]

At a criminal trial, the judge did not abuse his discretion in permitting the prosecutor to ask a witness a question that implicated the witness's prior consistent statement, where the Commonwealth was entitled to rebut a misleading impression left by cross-examination; moreover, even if it were error to have permitted the question, the judge's quick cutting off of the questioning rendered minimal any harm inflicted. [496-499]

The judge at a criminal trial did not abuse his discretion in denying the defendant's request to read into the record, as a past recollection recorded, a witness's statement to police, where the witness's memory of the incident was fully revivable, even though it was inconsistent with her prior statement; further, the witness's inability to recall a single, inconsequential detail did not mandate the admission of her entire prior statement. [499-501]

At a murder trial, the judge did not take away the defendant's right to attack the adequacy of the police investigation by admonishing the jury that they were to decide the case based on the evidence at trial, not what they saw depicted on television programs or in science fiction. [501-504]

This court declined to exercise its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or to order a new trial, where the testimony of a medical examiner regarding the conclusion contained in an autopsy report that another medical examiner had created, while violating the defendant's right of confrontation guaranteed by the Sixth Amendment to the United States Constitution, did not give rise to a substantial likelihood of a miscarriage of justice, in that the properly admitted evidence against the defendant was overwhelming. [504-505]

INDICTMENTS found and returned in the Superior Court Department on December 21 and 29, 1995.

After review by this court, 436 Mass. 537 (2002), the cases were tried before *Hiller B. Zobel,* J.

*Leslie W. O'Brien* for the defendant.

*Melissa Weisgold Johnsen*, Assistant District Attorney, for the Commonwealth.

CORDY, J. On the evening of November 12, 1995, four children, three boys and one girl, were found in their home suffering from severe injuries. All four had been shot in the head; one also had been attacked with a large knife. Within days, the three boys died. The girl survived.

In 1995, the defendant was indicted for the murders of the three boys, G. L. c. 265, § 1; and armed assault with intent to murder the girl, G. L. c. 265, § 18 (*b*).[1] He was found guilty on all the indictments on December 9, 1997. In 2002, his convictions were set aside because of the admission in evidence of a statement obtained from him in the absence of adequate Miranda warnings. *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 548, cert. denied, 537 U.S. 942 (2002). After a second jury trial, the defendant was found guilty of three charges of murder in the first degree on the theories of deliberate premeditation and extreme atrocity and cruelty, as well as guilty on all the remaining charges. The defendant appealed.

We affirm the convictions and decline to grant relief under G. L. c. 278, § 33E.

1. *Trial.* The jury could have found the following facts based on the evidence adduced at trial.

In 1995, the defendant was living with the victims and their mother in an apartment in Lowell. The mother began asking the defendant to move out so she could reconcile with her husband. The defendant repeatedly refused, professing his love for the mother and asking her to let him stay because he had no money. On the night of November 11, 1995, the defendant awoke the mother and asked her a question that, in hindsight, was ominous. He asked her what she loved most in the world. "I love my children the most," she replied.

The next day, November 12, the mother told the defendant that he had until the end of the month to vacate her apartment. Later on, while the mother was visiting at a friend's apartment, the defendant telephoned her and again posed his query. In

---

[1] The defendant was also charged with assault and battery by means of a dangerous weapon on the girl and one of the boys, G. L. c. 265, § 15A (*b*); as well as possession of a firearm without a license, G. L. c. 269, § 10 (*a*).

response, the mother asked him not to hurt her children. She then left to return home.

The defendant had placed the telephone call from the apartment next door to the one he shared with the mother and the four victims. At the time, the victims were at home alone watching television. After making the telephone call, the defendant entered the victims' apartment, walked into the room where they were sitting, and proceeded to shoot each of the four children in the head. When the oldest boy attempted to flee, the defendant shot him in the head again and then struck him with a large knife that the family kept in the kitchen.[2]

Although wounded, the girl escaped through a window and ran back into the apartment building to get help. She was bleeding from the head. When her neighbor answered the door the girl struggled with her words, gestured to her head to indicate a firearm, and said "Thy," the name she and her brothers called the defendant. Her neighbor then ran across the hallway and yelled, "Vuthy, are you crazy? Why are you killing the kids?" Eventually, the oldest child opened the door on his knees.

Police and emergency responders arrived at the apartment and took the children to nearby hospitals. Over the next several days, the three boys died as a result of their wounds. The surviving female child provided a firsthand account of the events at trial.

After shooting the victims, the defendant left the apartment. Neighbors came to his aid when they saw him stumbling in an alleyway as a result of an apparent gunshot wound to his ear. They gave him a new shirt and drove him to a friend's apartment nearby. The police found him there and arrested him.

Later, the police discovered a firearm in a trash barrel near the victims' apartment. The defendant's deoxyribonucleic acid (DNA) was found on the gun, as well as on items in the apartment.

At trial, the defendant attempted to demonstrate that law enforcement had assumed from the beginning that he was the assailant based on the story of the surviving victim. The defendant argued that the victim's perception was faulty and that she could not say for certain whether someone other than the defendant may have perpetrated the attacks.

---

[2]Both a meat cleaver and a machete-type knife, each with blood on it, were found at the crime scene.

2. *Claims of error at trial.* The defendant raises several grounds for reversal. First, he argues that the judge violated Rule 6 of the Rules of the Superior Court (LexisNexis 2008-2009) by requiring the defendant to exercise his peremptory challenges before the Commonwealth with regard to certain jurors during individual voir dire. He next argues that the judge erroneously allowed the Commonwealth to bolster the girl's testimony with a prior consistent statement, and erroneously denied the defendant an opportunity to read an inconsistent statement by the victim into the record as a past recollection recorded. Finally, he contends that the judge erroneously took away his right to attack the adequacy of the police investigation by admonishing the jury that they were to decide the case based on the evidence at trial, not what they saw depicted on television programs or in science fiction.

We address each of these issues in turn.

a. *Order of peremptory challenges.* The defendant claims that he was deprived of an important advantage at trial because the judge adopted an unconventional individual voir dire procedure. Prior to jury selection, the judge explained that the procedure would follow a two-stage process. After filling out a juror questionnaire, each prospective juror would appear individually before the judge and counsel for the Commonwealth and the defendant. Based on the juror's questionnaire responses, the judge would investigate any concerns he had, and then would permit counsel to suggest further questions. Once the questioning stage concluded, the judge would give the parties the opportunity to exercise a peremptory challenge, alternating which party went first for each juror. Thus, the process was designed to proceed as follows: For the first juror, the Commonwealth would choose whether to exercise a challenge, followed by the defendant; for the second juror, the defendant would choose first, followed by the Commonwealth.[3] Pursuant to Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979), both the defendant and the Commonwealth were afforded sixteen peremptory challenges.

The defendant argues that it was error to require him to exercise his challenges first in this fashion because the procedure devi-

---

[3]When asked prior to individual voir dire, neither the defendant nor the Commonwealth objected to this procedure.

ated from the method set out in rule 6.[4] However, by its terms, rule 6 does not apply to the defendant's case. That rule, which normally requires the Commonwealth to exercise its peremptory challenges before the defendant is required to act, does not apply to empanelment conducted by means of individual voir dire. There is no rule of the Superior Court that governs such empanelments, the process being left largely to the discretion of the judge, see *Commonwealth* v. *Sires*, 413 Mass. 292, 308 n.19 (1992), provided it results in an impartial jury.[5,6] See *United States* v. *Martinez-Salazar*, 528 U.S. 304, 307 (2000).

We turn now to whether there was some other error during

[4]Rule 6 of the Rules of the Superior Court (LexisNexis 2008-2009) provides:

"The procedure in the matter of peremptory challenges of jurors, except when an individual voir dire is conducted, shall be as follows, unless specially otherwise ordered in a particular case. The jurors shall first be called until the full number is obtained. If any examination on oath of the jurors is required, it shall be made, and any challenge for cause shall be acted on, and if any jurors shall be excused others shall be called to take their places. When it has been determined that all the jurors stand indifferent in the case, each plaintiff shall at one time exercise his right of peremptory challenge as to such jurors, and after others have been called to take the places of those challenged, and it has been determined that they stand indifferent in the case, shall at one time exercise his right of challenge of such others, and so on until he has exhausted his right of peremptory challenge or has ceased to challenge. Each defendant shall then exercise his right in the same manner. Each plaintiff, if his right of peremptory challenge has not been exhausted, shall then again exercise his right in the same manner, but only as to jurors whom he has not already had opportunity to challenge, and the parties shall likewise exercise the right in turn, until the right of peremptory challenge shall be exhausted or the parties shall cease to challenge. No other challenging, except for cause shown, shall be allowed."

[5]General Laws c. 234, § 28, authorizes the individual examination of each juror but, aside from indicating that such examination must be performed outside the presence of the other prospective jurors, the statute is silent as to procedure.

[6]This is not to say that a judge may adopt any procedure he or she sees fit for individual voir dire. As the Appeals Court has noted, individual voir dire is excepted from rule 6 because the process takes longer than ordinary voir dire. That is, the exception is designed to permit judges to craft more efficient procedures in light of the individualized attention paid to each prospective juror. See *Commonwealth* v. *Jean-Louis*, 70 Mass. App. Ct. 740, 744 (2007), quoting *Commonwealth* v. *Barry*, 397 Mass. 718, 725-726 (1986) (interpreting earlier version of rule 6). The defendant argues first that the judge's chosen procedure in this case was not more efficient than the ordinary rule 6 order,

jury empanelment that demands relief. Under G. L. c. 234A, § 74, a defect in jury empanelment does not warrant reversal unless a defendant objects to it "as soon as possible after its discovery or after it should have been discovered and unless [he] has been specially injured or prejudiced thereby." Additionally, constitutional due process and fair trial concerns require us to confirm that the procedures did not impair the defendant's right to an impartial jury. See *Ross* v. *Oklahoma*, 487 U.S. 81, 90-91 (1988). See also *United States* v. *Martinez-Salazar, supra* at 313-314 ("Because the defendant [in the *Ross* case] received all that state law allowed him, and the fair trial that the Federal Constitution guaranteed, we rejected his due process challenge").

The voir dire procedure was tarnished by no error, defect, or irregularity that might implicate G. L. c. 234A, § 74, let alone any prejudice — constitutional or otherwise — that requires us to reverse the convictions.[7] First, as we have already shown, the defendant received the sixteen challenges to which he was entitled under Mass. R. Crim. P. 20 (c) (1). Second, aside from rule 6 (which does not apply), there is no source for the defendant's

---

and therefore, second, that it was error to adopt the procedure.

Although efficiency concerns may lie at the heart of the individual voir dire exception, see *Commonwealth* v. *Jean-Louis, supra,* our focus is on the protection of a more fundamental value, the right to an impartial jury. See *United States* v. *Martinez-Salazar,* 528 U.S. 304, 307 (2000). We will not find error on the basis that a judge adopted an individual voir dire procedure that may have been more or less efficient than the procedure contemplated for ordinary voir dire. However, novel procedures, such as the one followed in this case, raise the possibility of prejudicial error. Although not constitutionally mandated, peremptory challenges enjoy a "venerable" status in our legal system. See *id.* at 311. Deviations from tried and true voir dire procedures with respect to their exercise invite extra scrutiny because problems associated with peremptory challenges overlap with problems associated with the right to a fair trial. The two are not completely distinct.

[7]The Commonwealth argues that the defendant's tardiness in objecting to the voir dire procedure should disqualify his argument on appeal because he did not object "as soon as possible," as required by G. L. c. 234A, § 74. The defendant did object to the voir dire procedure, but not until after he used his second peremptory challenge to excuse the fourth prospective juror. The Commonwealth also argues that the defendant's objection was insufficiently specific because he did not cite rule 6 explicitly. See *Commonwealth* v. *Bartie,* 401 Mass. 1009, 1010 (1988). The defendant did indicate concern about having to exercise his challenges first, but he did not mention rule 6. However, we do not address these issues because, as a whole, the voir dire procedure did not prejudice him, and therefore relief under G. L. c. 234A, § 74, is unavailable.

claim that he was entitled to the advantage of the Commonwealth exercising its peremptory challenges first. Nothing in the United States Constitution or the Massachusetts Declaration of Rights establishes the right to peremptory challenges, let alone the order in which they occur. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 292, cert. denied, 493 U.S. 940 (1989). Rather, peremptory challenges "are one means to achieve the constitutionally required end of an impartial jury," *United States* v. *Martinez-Salazar, supra* at 307. Finally, we have no doubt that the voir dire procedure achieved that end here because the defendant used only fifteen out of his sixteen peremptory challenges.[8] Had the defendant been concerned about the seating of one of the jurors, he could have challenged the juror without cause. See *Ross* v. *Oklahoma, supra* at 88. Consequently, he cannot complain that he was prejudiced by the voir dire procedure or that it raises a substantial likelihood of a miscarriage of justice.[9] See *Commonwealth* v. *Alvarado*, 50 Mass. App. Ct. 419, 420 (2000), quoting *Commonwealth* v. *Stone*, 366 Mass. 506, 509 (1974).

b. *Prior consistent statement.* Faced with the girl's testimony that she had seen the defendant strike her brother with a machete-type knife, the defendant attempted to impeach her with inconsistencies in her prior statements to police. On cross-examination, the defendant elicited testimony that the first time the victim "testified" to having seen anyone with a machete was on direct examination the day before, and that two days after the attacks she had told Officer Phillip Conroy that she could not

---

[8]We do not address whether the defendant would have been prejudiced had he run out of challenges.

[9]We also note that the voir dire procedure was not as rigid as the defendant alleges. Both parties made challenges that were technically out of turn. They did so in lieu of questioning a prospective juror, the first step of the judge's procedure. Thus, although the defendant identifies six instances where he exercised a peremptory challenge before the Commonwealth was required to exercise its challenge, the defendant exercised four challenges without waiting to see if the Commonwealth would challenge. Similarly, on at least three occasions, the Commonwealth challenged a prospective juror prior to exercising its opportunity to have the judge ask the juror questions. While these facts are not dispositive, they do belie the defendant's view that the voir dire procedure disadvantaged him. That the defendant does not complain about the challenges he opted to make before the Commonwealth undermines his argument.

remember seeing anyone with a meat cleaver or a machete.[10] To
the extent that this examination left the impression that the victim
had never mentioned a machete or meat cleaver until her testimony
at the trial, it was a misleading one that the Commonwealth was
entitled to rebut. *Commonwealth* v. *Rodriquez,* 454 Mass. 215,
221-222 (2009). The Commonwealth attempted to do so by ask-
ing the victim about a conversation she had with another police
officer, Captain Kevin Sullivan, at the hospital just hours after the
attack, during which she told him that she had seen the defendant
attack her brother with a machete or a large knife.

The defendant objected on the ground that the Commonwealth
was attempting to introduce a prior consistent statement of the
victim. The Commonwealth did not disagree, but asserted that
the defendant's cross-examination had implied that the victim's
testimony was a recent contrivance, therefore satisfying the

---

[10]The relevant portions of the cross-examination were as follows:

DEFENSE COUNSEL: "Yesterday you talked about seeing someone with
a machete, isn't that right?"

THE VICTIM:       "Yes."

DEFENSE COUNSEL: "And that was the first time you had ever testified
that you had ever seen anybody with a machete
during this incident, isn't that right?"

THE VICTIM:       "Yes."

DEFENSE COUNSEL: "And, in fact, when you were speaking with [Of-
ficer Conroy], a couple of days later, he asked you
specifically if you saw anybody with a machete or
a meat cleaver, isn't that right?"

THE VICTIM:       "Yes."

DEFENSE COUNSEL: "And you told him a couple of days later that you
don't remember seeing anything like that happen-
ing, isn't that right?"

THE VICTIM:       "I don't remember."

(Defense counsel shows the victim a document to refresh her recollection.)

DEFENSE COUNSEL: "[W]hen you were talking to [Officer Conroy],
you told him you couldn't remember seeing
anybody with a machete or meat cleaver, right?"

THE VICTIM:       "Yes."

prerequisite for the introduction of a prior consistent statement. *Commonwealth* v. *Novo*, 449 Mass. 84, 93 (2007). See Mass. G. Evid. § 613 (b) (2) (2010). The defendant disagreed. Ultimately, the judge agreed with the defendant that the cross-examination left the impression that the victim's memory was faulty, not that she had recently contrived her testimony. Nevertheless, he decided to permit the Commonwealth "to ask [the victim] what happened" at the hospital. The following exchange took place concerning statements the victim made to Captain Sullivan:

THE PROSECUTOR:   "What happened up at the hospital?"

DEFENSE COUNSEL:  "Objection."

THE VICTIM:       "I told [Captain Sullivan] that he [the defendant] had a meat cleaver."

THE PROSECUTOR:   "A meat cleaver or something else?"

DEFENSE COUNSEL:  "Objection, your Honor."

THE JUDGE:        "Sustained."

THE VICTIM:       "A knife —"

THE JUDGE:        "No, no, no."

THE PROSECUTOR:   "Did you tell Detective —"

THE JUDGE:        "Move on to something else . . . ."

The defendant argues that this constituted an erroneous introduction of a prior consistent statement by the victim and, as a result, that he must be afforded a new trial.

It is clear that the Commonwealth was entitled to rebut in some fashion the impression left by the defendant's cross-examination. While generally, "impeachment of a witness by prior inconsistent statements or omissions does not, standing alone, entitle the adverse party to introduce other prior statements made by the witness that are consistent with his trial testimony," *Commonwealth* v. *Bruce*, 61 Mass. App. Ct. 474, 482 (2004), the Commonwealth is permitted to rehabilitate the witness by asking questions designed to explain or contradict the inconsistency

even though prior consistent statements by the witness are implicated. See *Commonwealth* v. *Rodriquez, supra*; *Commonwealth* v. *Tennison*, 440 Mass. 553, 563-564 (2003); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375-376 (1978). To the extent that the prosecutor's question might have elicited an explanation from the victim that her statement made sometime later to Officer Conroy was a lapse in memory rather than a factual assertion that she did not see the defendant wield a machete or meat cleaver during the assault, such testimony would have been appropriate rebuttal. *Commonwealth* v. *Rodriquez, supra*. Consequently, the judge did not abuse his discretion in permitting the prosecutor to ask the victim what happened at the hospital on the day of the brutal attack.

However, even if it were error for the judge to have permitted the question, the judge quickly cut off the Commonwealth's further questioning and sustained the defendant's objection. As a result, the victim was unable to testify at any length or with much clarity.[11] Thus, any harm inflicted on the defendant was minimal. See *Commonwealth* v. *Dougan*, 377 Mass. 303, 309 (1979). There is nothing to suggest that the defendant's attempts at impeachment, if left fully intact, would have had any impact on the overwhelming nature of the victim's testimony. Whether the victim was always consistent regarding the specific nature of the weapons the defendant wielded during the assault on the four children, the defendant could not undo or undermine her testimony that she saw the defendant carry out the attacks. Any distinction concerning what long-bladed implement was used would have made no difference.

c. *Past recollection recorded.* The defendant's impeachment of the girl did not end with her inconsistent statements concerning the machete and meat cleaver. He also attempted to demonstrate that the girl did not identify the defendant as her attacker until she heard her neighbor yell the defendant's name. That is, he tried to undermine the strength of the girl's identification by showing that the victim — a child at the time — simply adopted her neighbor's unfounded conclusion that it was "Thy." On direct examination, the girl testified that when her neighbor

[11]The judge subsequently denied the prosecutor's request to question Captain Sullivan about statements made by the victim to him at the hospital.

opened her door that the victim pointed to her head and said, "Thy," the defendant's nickname. Only then did her neighbor run across the hall and yell the defendant's name. On cross-examination, the girl admitted that in her statement to Officer Conroy she indicated that she could not speak when she arrived at her neighbor's door. However, she also testified on cross-examination that her statement to Officer Conroy was incorrect and that she did, in fact, say the defendant's name before her neighbor did.

After presenting his defense, but before resting, the defendant attempted to read into the record the victim's statement to Officer Conroy. The defendant argued that the victim had testified that she could not remember what happened when she arrived at her neighbor's door and therefore that her statement to Officer Conroy qualified as a past recollection recorded.[12] The judge denied the defendant's request to read the statement into the record, which the defendant argues was in error.

A statement is admissible as a past recollection recorded if "(1) the witness has no revivable recollection of the subject, (2) the witness had firsthand knowledge of the facts recorded, (3) the witness can testify that the statement was truthful when made, and (4) the recording was made when the events were fresh in her memory." Commonwealth v. Nolan, 427 Mass. 541, 543 (1998). However, it is up to the judge's discretion whether to admit such a statement. Id. at 544.

In this case, the defendant's argument fails the first element of the Nolan test because the victim testified that her memory was not, in fact, faulty. In attempting to introduce the statement that the victim made to Officer Conroy, the defendant argued that the victim could not remember whether she uttered the defendant's name before her neighbor did. However, this mis-

---

[12]At trial, the defendant focused his argument on the girl's testimony concerning whether she said the defendant's name before her neighbor did. However, we note that he never indicated whether his request to admit the victim's statement to Officer Conroy was limited to that subject matter, or whether he wanted to read the statement in its entirety. On appeal, the defendant identifies other portions of the victim's testimony where she indicated that she did not remember details, thus demonstrating that he desired to introduce her entire statement to Officer Conroy. There is no need to speculate about the defendant's intentions as we uphold the judge's decision without regard to the contents of the statement.

states the victim's testimony. The victim did not say that she could not remember what happened when she ran to her neighbor's apartment to get help; rather, she testified that she said the defendant's name, "Thy," and pointed to her head to indicate a firearm. When pressed about her statement to Officer Conroy, the victim said that her statement did not accurately reflect what had happened.[13] That is, her memory was fully "revivable," even though it was inconsistent with her prior statement. See *id.* at 543.

Alternatively, the defendant argues that he should have been able to introduce the statement as a past recollection recorded because the victim admitted that she could not recall telling Officer Conroy that she had heard someone lock the door to her apartment immediately before the attack. While it is true that a past recollection recorded may be introduced if a witness is unable to "testify fully," *id.* at 544, it is not the case that the inability to remember a single, inconsequential detail *mandates* the admission of the witness's entire prior statement.

Finally, the defendant ignores the role that discretion plays in admitting past recollections recorded. *Id.* Even assuming that the victim's recollection was not revivable, the judge acted within his discretion when he refused to admit her statement to Officer Conroy, especially given the fact that the defendant waited five days before attempting to introduce her statement. See *id.*

d. *Removal of* Bowden *defense.* Throughout trial, the defendant argued that the police assumed too quickly that the defendant was the culprit and, as a consequence, ignored conflicting evidence and conducted an incomplete forensic investigation. The judge thus acquiesced to the defendant's request that he give a so-called *Bowden* instruction, see *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980) (*Bowden*), advising the jury that reasonable doubt as to the defendant's guilt could

---

[13]The victim expressly stated that her memory differed from what she told Officer Conroy:

> DEFENSE COUNSEL: "But it's your memory today that you had said something [to your neighbor] first?"
>
> THE VICTIM:          "Yes."

arise from a finding that law enforcement failed adequately to investigate the crime. The defendant contends, however, that subsequent comments by the judge had the effect of neutralizing his defense. Immediately following the *Bowden* instruction, the judge said:

> "And I remind you that this is real life and not CSI. I say that without being facetious. It's been observed across the country that people who've watched that particular program and similar programs tend to think that life is all that sort of science fiction and it's not.

> "Now, it may be, I say it may be, it may not be but if it is, then maybe you would like to have heard the testimony of a person or somebody or persons for that matter, that neither side had called has a witness. Once again, you may not speculate or guess as to what that witness's testimony might have been. Not knowing the testimony, of course, you can't tell which side it would have helped or hurt. I urge you, therefore, not to spend any time arguing about why so and so didn't testify."

The defendant argues that this instruction went beyond admonishing the jury against improper speculation and impermissibly precluded the jury from considering the inadequacies in the law enforcement investigation. See *Bowden, supra.* The defendant objected to the instruction, thus we review his claim for prejudicial error. *Commonwealth* v. *Williams,* 439 Mass. 678, 682 (2003).

"The *Bowden* instruction permits jurors to consider evidence (actually presented) of police failure to take certain investigatory steps, as it relates to the reliability of the Commonwealth's case, and indeed evidence of such failures alone may be sufficient to create a reasonable doubt of the defendant's guilt." *Commonwealth* v. *Tolan,* 453 Mass. 634, 652 (2009). The judge may not "remove[] this evidence from the jury's consideration, and in so doing invade the province of the jury to decide what inferences to draw from certain evidence," *Bowden, supra* at 486, but the judge is permitted to instruct the jury against speculating about nonexistent evidence. See *Commonwealth* v. *Tolan, supra.* That is, the jury may consider evidence of absence,

but they may not fill that void with evidence conjured from their own speculation.

Here, the defendant elicited testimony that law enforcement did not perform certain forensic tests and did not follow up on alternate leads. He argues that the judge's reference to "CSI," a popular television program about forensic science, and to science fiction, removed that evidence from the jury's consideration because the judge implied that the defendant's argument was not based in reality. We disagree. The judge properly highlighted the defendant's *Bowden* argument and then properly admonished the jury against inventing their own evidence. See *Commonwealth* v. *Tolan, supra.* He did not asperse the defendant's argument. There was no error. See *Commonwealth* v. *Williams, supra.*

It bears noting that the judge's instruction likely was influenced by several references to "CSI" at trial. For example, the Commonwealth asked a police officer who collected forensic samples at the crime scene in 1995 whether investigators on television programs such as "CSI" use a dusting technique to search for fingerprints. The witness answered affirmatively, but the judge immediately cautioned the jury that they were not to assume that "CSI accurately mirrors life in the outside world." The defendant himself referenced the television program during the cross-examination of the Commonwealth's DNA expert. In total, "CSI" was referenced four times during the evidentiary portion of the trial: once by the Commonwealth, once by the judge, and twice by the defendant. Thus, the defendant's argument that the judge prejudiced his *Bowden* defense ignores the prevalence of "CSI" references at trial. In context, the judge's instruction was designed to confine "CSI" to its rightful place in fiction, not reality.

That said, we do not indorse the judge's formulation of the *Bowden* instruction. Based on the judge's language, he was apparently concerned about the so-called "CSI effect," the theory that jurors who watch forensic science television programs like "CSI" will hold prosecutors to an unreasonably high standard of proof because of the prowess displayed by fictional forensic scientists. However, we note that the "CSI effect" may be largely speculative:

"While the *CSI* effect has been widely noted in the

> popular press, there is little objective evidence demonstrating that the effect exists. As is often the case with legal issues, the pace of public discussion has outstripped the ability of scholars to research the issue. Lacking any empirical data, discussions of the *CSI* effect have instead been based on the personal impressions of lawyers and legal scholars." (Footnote omitted.)

Tyler, Viewing *CSI* and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction, 115 Yale L.J. 1050, 1053 (2006). Given its uncertain foundation, the "CSI effect" is a subject beyond the permissible scope of judicial notice. The same holds true for the breadth and nature of the gap between fictional and factual forensic techniques. The implication of a "CSI" instruction, such as the one given here, is that the actual capabilities of law enforcement forensics are much less than that of "CSI" specialists, in the absence of any evidence on the subject. Such references in the context of *Bowden* instructions may be problematic in some cases and are unnecessary; jurors can and should be trusted to separate what they see on television from what evidence is presented at trial. See *Commonwealth v. Furr*, 58 Mass. App. Ct. 155, 161 (2003), quoting *Commonwealth v. Roberts*, 378 Mass. 116, 128 (1979). In this case, the judge acted properly when he cautioned the jury about the relevance of "CSI" after it was referenced in testimony, but it was undesirable for him to do so again in his jury instructions.

3. *General Laws c. 278, § 33E*. We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised on appeal. One issue gives us pause, but is ultimately without consequence.

Autopsies were performed on the three male victims in 1995. At the 2007 trial, the Commonwealth called as a witness a medical examiner who did not perform the autopsies, but who did review the autopsy reports. Most of the witness's testimony was limited to his own opinions and conclusions. This was permissible. See *Commonwealth v. Nardi*, 452 Mass. 379, 390-391 (2008). However, when asked what was the cause of death for one of the victims, the witness expressly conveyed the conclusion

contained in the original autopsy reports. We have held such testimony violates a defendant's right to confront witnesses against him under the Sixth Amendment to the United States Constitution. *Id.* at 394. The defendant did not object to the testimony. In any event, the evidence, both forensic and testimonial, against the defendant was overwhelming. There is no substantial likelihood of a miscarriage of justice as a result of the error. See *id.* at 395-396.

*Judgments affirmed.*