## COMMONWEALTH *vs.* JOHN J. HINDS.

Middlesex. March 5, 2010. - June 10, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, BOTSFORD, & GANTS, JJ.

*Homicide. Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal,* Instructions to jury, Jury and jurors, Voir dire, Challenge to jurors. *Jury and Jurors.*

At a murder trial, the judge properly denied the defendant's request for an instruction on involuntary manslaughter, based on both reasonable provocation and excessive use of force in self-defense, where there was no evidence that one victim had provoked the defendant at all, and no evidence that the defendant had not had time to "cool off" from provocation by the other victim thirteen days before the shooting; and where, because the defendant was not entitled to use any degree of force in self-defense in confronting the victims, he did not deserve an instruction regarding the excessive use of force in self-defense. [88-92]

INDICTMENTS found and returned in the Superior Court Department on November 12, 1998.

After review by this court, 450 Mass. 1 (2007), the cases were tried before *Hiller B. Zobel,* J.

*Willie J. Davis* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney, for the Commonwealth.

GANTS, J. On October 16, 1998, the defendant, in the kitchen of his mother's home, shot his sister, Patricia Melo, in the head,[1] then walked outside and shot and killed his half-brother, Joseph Warren Beranger (Warren), and his sister-in-law, Mary

---

[1] Patricia Melo survived the gunshot to her head.

Beranger (Mary).[2] A jury in the Superior Court convicted the defendant of the premeditated murder in the first degree of Warren, of murder in the second degree of Mary, of armed assault with intent to murder Melo, and of the assault and battery of Melo by means of a dangerous weapon.[3,4]

Represented by new counsel, the defendant appeals from his convictions. He argues that the judge erred in refusing to instruct the jury on voluntary manslaughter. We conclude that the evidence did not permit the jury to find the defendant guilty of voluntary manslaughter with respect to the killing of either Warren or Mary, and that the judge did not err in refusing to give such an instruction. After a review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his convictions to a lesser degree of guilt or to order a new trial. Accordingly, we affirm the defendant's convictions.

1. *Background.* The evidence, viewed in the light most favorable to the Commonwealth, showed that the defendant lived with his eighty-seven year old mother, Mary Hinds (mother), at the two-family house she owned at 207 Charles Street (rear) in Cambridge.[5] In March, 1998, the mother broke her hip and the defendant asked Melo if their mother could stay with her, because he was going to have heart bypass surgery. Their

---

[2]Joseph Warren Beranger was referred to at trial as both Joseph and Warren. We shall refer to him by his middle name and to his wife, Mary Beranger, by her first name to avoid confusion.

[3]Before trial, the defendant pleaded guilty to the illegal carrying of a firearm. The judge sentenced the defendant to consecutive terms of life imprisonment for the murders of Warren and Mary, the first without the possibility of parole, and prison terms of from fifteen to twenty years, from nine to ten years, and from three years to three years and one day for the convictions, respectively, of armed assault with intent to murder, assault and battery by means of a dangerous weapon, and illegal carrying of a firearm, to be served concurrently with each other and with the life sentence for the death of Warren.

[4]This was the second trial on these charges. At his first trial, the defendant was convicted of premeditated murder in the first degree of both Warren and Mary and the other charges. The judgments were reversed and remanded for a new trial because of an error in the judge's instruction regarding the evaluation of expert testimony. *Commonwealth* v. *Hinds*, 450 Mass. 1 (2007).

[5]An alternate address for the house is 157 1/2 Fifth Street. See *Commonwealth* v. *Hinds*, *supra* at 3 & n.3. Mary Hinds lived in the first-floor apartment; she rented out the second-floor apartment; the defendant lived in the third-floor attic.

mother remained at Melo's house in Revere until October 8, 1998. On October 1, Warren and Mary arrived from California to stay at Melo's house for a few days before visiting Warren's relatives in Canada. On October 3, Warren, Mary, and Melo went to the mother's house to retrieve the mother's telephone and some of her clothes.[6] They did not have a key to the mother's first-floor apartment, and no one was home, so Warren opened the door by "picking" the lock.[7]

That evening, Warren sent an electronic mail message (e-mail) to the defendant, stating:

> "Since you refused Ma's admission to her own home and have taken it upon yourself not to allow her access to her possessions at her convenience i.e. cordless phone and clothing, and since I have 'durable power of attorney,' I am exercising my rights of 'durable power of attorney,' I am putting the house up for sale in one week's time.[8] Since she does not have access to her own home at her convenience, [there's] no need to have the house."

Warren wrote that the defendant would have a right of first refusal to purchase the property.

On October 4, at approximately 11 A.M., the defendant spoke with a Cambridge police officer and reported that Warren had attempted to break into his mother's apartment. On October 7, after discussing the matter with a Cambridge police detective, the defendant applied for and obtained a temporary protective order under G. L. c. 209A, which ordered Warren not to abuse or contact the defendant, to stay at least one hundred yards away from him, and to stay away from their mother's residence at 207 Charles Street. On October 8, while Melo was at work, the defendant, with his brother Charles, took their mother out to

---

[6] The mother traveled with them to her home, but remained in the car.

[7] The defendant at the time was with his former wife, Donna Grillone, at her home in Somerville, and learned from his brother, Charles, who lived nearby on Charles Street, that Warren, Mary, Melo, and their mother were trying to break into the apartment. Charles asked him to come to the house, but the defendant refused.

[8] In 1992, the mother had executed a general durable power of attorney that gave power of attorney to Warren and, if he were unable to serve in that capacity, to Melo, then known as Patricia Cardoso.

lunch and brought her back to her own house, where she remained until the killings on October 16.

On the morning of October 16, Warren, Mary, and Melo went together to the Cambridge Division of the District Court Department to attend the hearing to determine whether the temporary protective order would become permanent. At the hearing, Warren was represented by counsel; the defendant appeared pro se. The defendant told the judge, "My mother made a statement to the whole family, 'As long she [*sic*] has that house and she's alive, I have a home,' and [Warren] was trying to sell the home over her head." The judge replied, "You have to be in fear of imminent physical harm, not just imminent sale of real estate," and ordered the protective order dismissed.

After the hearing, Warren, Mary, and Melo stood on the corner one block away from the mother's house, waiting for the police to arrive to assist them in entering the house so they could bring the mother to Melo's house. After Warren twice telephoned the police and no police officer arrived, Melo decided to go into the house alone and pick up her mother; Warren and Mary waited at the corner. The defendant, who had returned earlier to his mother's house after the hearing, went outside to his automobile to find cigarettes he kept in the trunk. He observed Warren and Mary at the corner, saw his gun in the trunk, concealed the gun in a briefcase that was also in the trunk, and returned to the house carrying the briefcase.

When Melo arrived at the house, the defendant was in the doorway and asked her what she was doing there. She said she was there to see her mother, and he allowed her inside. When she spoke with her mother in the kitchen, the mother asked her, "What are you doing with Warren?" Melo replied, in an apparent reference to the defendant, "Well, you don't know what your golden boy did, do you?" Melo explained that she had been at the court house because of the protective order. The mother said that the defendant's former wife had told her that the defendant got a protective order because Warren had hit him. Melo said, "I was there; nothing happened." The defendant said, "Oh, yeah?" pulled a gun from his sweater vest, and shot her in the head from six to seven feet away. When she tried to move, he told her, "Stay down or I'll shoot you again."

The defendant then left the house, walked to the corner, and

fired two shots at Mary, striking her twice in the head. He then shot Warren in the head and back. Mary died that day; Warren died from his gunshot wounds on October 23.

After shooting Warren and Mary, the defendant walked past Kevin Christie, who had been delivering a package and heard the gunshots. After Christie spoke to the defendant, the defendant replied, "They'll probably fry my ass now." Christie told him, "No, you could say self-defense." The defendant said, "Yeah, right," and "kind of chuckled" as he walked past Christie.

The defendant returned to the house, telephoned the 911 police emergency line, and told the dispatcher he had just killed his brother and sister-in-law, and shot his sister. When asked if they were injured, he replied, "I hope they're dead." While on the telephone with the dispatcher, the defendant said to Melo, "I wish I could have killed you, Patty." He said he would be standing outside in front of the house waiting for a police officer.

The defense at trial was that the defendant was not criminally responsible at the time of the shootings. Dr. Howard Martin Lester, a forensic psychologist, testified that the defendant suffered from an adjustment disorder with anxiety after his quadruple bypass surgery in April, 1998. This condition, which Dr. Lester characterized as a mental disease, was exacerbated by the defendant's fear that he was going to be physically harmed by Warren[9] and by Warren's threat to sell the house through his power of attorney. After the judge dismissed the protective order, the defendant was terrified, believing that he was about to be harmed, perhaps killed, and that, with the dismissal of the order, he no longer had the protection of the law. Dr. Lester offered the opinion that, at the time of the shootings, the defendant suffered from a mental illness that caused him to lack substantial capacity to appreciate the wrongfulness of his conduct and to conform his behavior to the requirements of law.[10] In rebuttal, the Commonwealth called Dr. Martin Kelly, a psychiatrist with a sub-

[9]The defendant testified at the first trial that, on the evening of October 3, he spoke to Warren by telephone to learn what he wanted at their mother's house. Warren threatened him, "I'm gonna get you. And when I do, I'll beat you on your fuckin' chest until you're dead." The Commonwealth offered this prior testimony in evidence.

[10]In support of this opinion, the defendant called his brother, James Hinds (James), who testified that the defendant feared Warren. He said that, at a

specialty in forensic psychiatry, who offered the opinion that the defendant did not suffer from a mental disease on the date of the shootings, and was able to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law.

2. *Denial of voluntary manslaughter instruction.* The defendant claims on appeal that an instruction on voluntary manslaughter, based on both reasonable provocation and excessive use of force in self-defense, was warranted by the evidence, and that the judge erred in refusing the defendant's request for such an instruction.[11] We conclude that a verdict of voluntary manslaughter was not supported by the evidence at trial, and that the judge correctly declined to give such an instruction.

In deciding whether a defendant is entitled to a voluntary manslaughter instruction based on either reasonable provocation or excessive use of force in self-defense, we view the evidence in the light most favorable to the defendant. *Commonwealth* v. *Acevedo*, 446 Mass. 435, 442-443 (2006). Under that view of the evidence, which is based in large part on the defendant's testimony from his prior trial that was offered in evidence by the Commonwealth, the defendant had long feared Warren. Warren had attempted to break into the house the defendant shared with his mother on October 3, and threatened the defendant's life during their telephone call later that evening. The defendant had obtained a protective order against Warren because he feared for

family reunion in April, 1998, after the defendant's heart surgery, Warren grabbed the defendant's shirt and rubbed it against the defendant's scar. The defendant also called Carolyn Dulong, James's former wife, who testified that she visited the defendant at the mother's house on the weekend before the shooting, and that he kept the blinds shut, and would jump up to look out from the blinds, saying, "He's coming to get me."

[11]In his final instructions, the judge told the jury they could consider reasonable provocation, but only as to the charge of armed assault with intent to murder. The judge said that for the Commonwealth to prove armed assault with intent to murder, it had to prove beyond a reasonable doubt the absence of the mitigating circumstance of provocation, "meaning that the defendant faced circumstances which would, in an ordinary person, produce such a state of anger, fright, or passion as to eclipse the person's capacity for restraint." After the jury asked for an explanation of the legal differences between armed assault with intent to murder and armed assault with intent to kill, the judge told the jury that, to prove armed assault with intent to murder, the Commonwealth must prove beyond a reasonable doubt that "there was no mitigating circumstance arising from an excessive use of force in defense of another person." The defendant does not claim error with respect to these instructions.

his life, and after the protective order had been dismissed and the defendant had returned home, he remained in fear and told his mother, "They can come in and get you; that they can come in and kill me if they want." At the time of the killings, the defendant was "kind of disoriented"; he believed that Warren, Mary, and Melo were there to take his mother from the house against her will, and that he had "no idea" what Warren would do to him.

The defendant tried to block Melo's entry into the house, but she knocked the defendant down by hitting the door as he tried to close it. When the defendant stood up and went into the kitchen, Melo was there standing "nose to nose" with the mother, pointing her finger at her, using profanity, and screaming that she had "started all this" and "was going to a nursing home." The mother, who was seated in a rocking chair, lost color in her face and was holding her chest and struggling to breathe. The defendant yelled to Melo to "knock it off." Melo would not stop screaming, and the defendant, who then had the gun in his hand, shot her. He turned to the mother and told her that he would protect her from harm.

With the gun still in his hand, he went outside to the corner to "talk some sense into" Warren and Mary, asking them, "Why are you guys fuckin' Ma and I around like this? Why don't you just leave us alone and go away?" Mary then put both hands on her pocketbook, as if she were trying to open it, and he told her to take her hands away from the pocketbook. When she failed to do so, he told her again, and the gun "went off." Warren then pushed his coat back with his right hand, and the defendant thought that Warren had a gun in his belt or back pocket. He told Warren to move his hand away, but Warren reached his hand to his back again. The defendant thought that Warren was reaching for a gun when he fired.

In *Commonwealth* v. *Acevedo*, *supra* at 443, we defined the mitigating circumstance of reasonable provocation:

> "Voluntary manslaughter is an unlawful killing 'arising not from malice, but "from . . . sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense." ' *Commonwealth* v. *Carrion*, [407 Mass. 263], 267 [(1990)], quoting *Commonwealth* v. *Nardone*, 406 Mass. 123, 130-131 (1989). Reasonable provoca-

tion is provocation that 'would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint.' *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). A jury instruction on reasonable provocation is warranted 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). The defendant's actions must be 'both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have "cooled off" by the time of the homicide, and that in fact a defendant was provoked and did not cool off.' *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985)."

At trial, defense counsel argued that the defendant was provoked by Melo yelling obscenities at the mother. While Melo's purported conduct may warrant an instruction regarding reasonable provocation with respect to the charge of armed assault with intent to murder, it cannot support a voluntary manslaughter instruction because the "provocation must come from the victim," in this case either Mary or Warren. *Commonwealth* v. *Ruiz*, 442 Mass. 826, 838-839 (2004). See *Commonwealth* v. *Espada*, 450 Mass. 687, 696 (2008). There was no evidence that the defendant had been provoked by Mary. Even assuming that the evidence at trial was sufficient to support the inference that the defendant was provoked by Warren, and had not cooled off by the time he shot him, the only conduct that arguably could have provoked a reasonable person was Warren's purported death threat on October 3, and a reasonable person would have cooled off in the thirteen days that had elapsed before the defendant shot and killed Warren. See *Commonwealth* v. *Benson*, 453 Mass. 90, 95 (2009) ("provocation occurs only when an action

of the victim triggers a *sudden* loss of self-control in the defendant" [emphasis in original]); *Commonwealth* v. *Colon*, 449 Mass. 207, 222, cert. denied, 552 U.S. 1079 (2007) ("Only incidents immediately preceding the shooting can constitute reasonable provocation"); *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 106 (2004) (not reasonable provocation "when there had been more than sufficient time for the defendant to cool off"). We decline the defendant's invitation to interpret reasonable provocation as the subjective experience of provocation by a person whose anxiety has resulted in paranoia. See *Commonwealth* v. *Johnston*, 446 Mass. 555, 559-560 (2006) (mental impairment may be considered in determining whether defendant formed specific intent to kill, but "it is *not* a mitigating factor that would reduce murder to manslaughter" [emphasis in original]).

The excessive use of force in self-defense is a separate mitigating circumstance that may justify a conviction of voluntary manslaughter. See Model Jury Instructions on Homicide 31-33 (1999). The defendant, however, is not entitled to an instruction on the *excessive* use of force in self-defense where there is no evidence that, at a minimum, the defendant was entitled to use *some* force in self-defense. See *Commonwealth* v. *Glacken*, 451 Mass. 163, 167 (2008); *Commonwealth* v. *Espada*, *supra* at 695. See also *Commonwealth* v. *Santos*, 454 Mass. 770, 781 (2009) (Gants, J., dissenting).

Here, there was no evidence of reasonable grounds to believe that the defendant was being attacked or about to be attacked and that his personal safety was in immediate danger when he confronted Mary and Warren; the only evidence was that they were waiting outside for Melo and the mother so they could drive to Melo's home together. Nor would a reasonable person have understood their purported hand movements to suggest that they were reaching for a gun to shoot the defendant. The defendant shot Mary first, and there was no evidence that Mary possessed a gun or opened her pocketbook. There was evidence that Warren owned a firearm, but not that he brought the firearm with him to Massachusetts or to the court house that morning. See *Commonwealth* v. *Clemente*, 452 Mass. 295, 321 (2008), cert. denied, 129 S. Ct. 1329 (2009) (evidence that victim reached for "fanny pack" not sufficient to constitute provocation). Nor

is there any evidence that the defendant attempted to retreat or avoid using physical force before shooting Mary and Warren. He chose to leave his mother's home and confront them on the street corner with gun in hand after he had shot his sister; he did not seek to avoid them.

Because the defendant was not entitled to use any degree of force in self-defense in confronting Mary and Warren, he did not deserve a voluntary manslaughter instruction regarding the excessive use of force in self-defense. The judge did not err in refusing to provide the jury with such an instruction.

3. *Review under G. L. c. 278, § 33E.* Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we observe that the judge, during the individual voir dire procedure, at times asked the defendant to decide whether to exercise a peremptory challenge before asking the Commonwealth.[12] As a result, six of the defendant's fourteen peremptory challenges were exercised as to prospective jurors where the defendant was asked before the Commonwealth if he was content. The defendant did not object to this procedure at trial. In *Commonwealth* v. *Vuthy Seng,* 456 Mass. 490, 493-496 (2010), where the same judge used essentially the same procedure in individual voir dire, we declared that "novel procedures, such as the one followed in this case, raise the possibility of prejudicial error." *Id.* at 494-495 n.6. Yet, we concluded that the procedure did not violate Rule 6 of the Rules of the Superior Court (LexisNexis 2008-2009), which does not apply to empanelment through individual voir dire, or the United States Constitution or the Massachusetts Declaration of Rights, neither of which establishes "the right to peremptory challenges, let alone the order in which they occur." *Id.* at 496. As in *Commonwealth* v. *Vuthy Seng, supra,* the defendant received the peremptory challenges to which he was entitled, and "cannot complain that he was prejudiced by the voir dire procedure or that it raises a substantial likelihood of a miscarriage of justice."

After our review of the record, we discern no error, considered alone or in conjunction with the defendant's claim of

---

[12]Prior to the voir dire, the judge told counsel that he would first ask the Commonwealth if it was content, then ask the defendant, and then, for the next juror, ask the defendant first. In practice, however, the Commonwealth and defense did not always alternate with each consecutive juror.

error, that produced a substantial likelihood of a miscarriage of justice. Nor, in view of the circumstances of this case, do we find any reason to reduce the murder verdicts to a lesser degree of guilt. The defendant at oral argument asked that we reduce to murder in the second degree the conviction of murder in the first degree for the killing of Warren, because the jury convicted the defendant of murder in the second degree for the killing of Mary. The jury acted reasonably within their province in finding a reasonable doubt as to whether the defendant premeditated the death of Mary, for whom he held no animosity, but finding no such doubt as to the killing of Warren, whom the defendant strongly disliked.

*Judgments affirmed.*