## Commonwealth *vs.* Isaac Wallace.

Suffolk. April 8, 2011. - July 6, 2011.

Present: Ireland, C.J., Spina, Botsford, Gants, & Duffly, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Instructions to jury, Assistance of counsel, Argument by prosecutor. *Firearms. Self-Defense.*

A criminal defendant who had not asserted or made any showing that he applied for (and was denied) a license under G. L. c. 140, § 131, to carry a firearm could not challenge, under the Second or Fourteenth Amendment to the United States Constitution, his conviction of carrying a firearm without a license in violation of G. L. c. 269, § 10 (*a*). [122-123]

In the circumstances of a murder trial, there was no error by defense counsel or the judge in their treatment of evidence of gang affiliations, nor was there any occurrence of a substantial likelihood of a miscarriage of justice. [123-124]

There was no merit to a criminal defendant's assertion that his trial counsel was constitutionally ineffective due to her failure to introduce material exculpatory evidence, where the evidence in question was mere speculation, would have diminished the primary defense theory at trial, and would not have materially aided the defense. [124-125]

At a criminal trial, a challenged remark made by a prosecutor during closing argument qualified as a fair inference to be drawn from the evidence and was not improper. [125-126]

At a murder trial, no error arose from defense counsel's failure to request jury instructions on self-defense, defense of another, or voluntary manslaughter, where there was no evidence permitting such instructions. [126-127]

There was no basis on the record of a murder trial for this court to grant any relief under G. L. c. 278, § 33E. [127]

Indictments found and returned in the Superior Court Department on January 2, 2003.

The cases were tried before *Patrick F. Brady*, J., and a motion for a new trial, filed on January 8, 2009, was considered by him.

*David H. Mirsky* for the defendant.

*Joseph M. Ditkoff*, Assistant District Attorney (*Edmond J. Zabin*, Assistant District Attorney, with him) for the Commonwealth.

IRELAND, C.J. On February 11, 2005, a jury convicted the defendant, Isaac Wallace, of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, G. L. c. 265, § 1; and carrying a firearm without a license, G. L. c. 269, § 10 (a).[1] The defendant's motion for a new trial was denied by the trial judge without an evidentiary hearing. The defendant is represented on appeal by counsel who had represented him in connection with his motion for a new trial. The defendant appeals from his convictions and from the denial of his motion for a new trial, contending that, in several respects, he was denied constitutionally effective assistance of trial counsel. The defendant also challenges his firearm conviction under the Second and Fourteenth Amendments to the United States Constitution and argues that we should exercise our power under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt. We affirm the defendant's convictions and the order denying his motion for a new trial. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. In the early morning of Thursday, August 1, 2002, Fritz Johnson (victim), who was nineteen years of age, picked up his friend, Atiya Britt, in his automobile to give her a ride. He stopped at a convenience store in the Dorchester section of Boston near the intersection of Washington Street and Brinsley Street. The victim parked his automobile just beyond the store, in the direction of Columbia Road. Britt stayed in the automobile while the victim went into the store.

Meanwhile, the defendant and some of his friends were on their way back home to the Mattapan section of Boston, having just purchased some marijuana. They were in a blue minivan that was owned and driven by Chivona Hughes, the only female in the vehicle. Next to Hughes in the front passenger seat was the defendant's brother. In the middle row of the van, Steven Nixon, the defendant's friend, sat behind Hughes. The defendant

---

[1]In addition, the defendant was convicted of possession of ammunition without a firearm identification (FID) card, G. L. c. 269, § 10 (h). This conviction was placed on file with the defendant's consent. Two other charges (firearm offenses) that had not been tried also were placed on file with the defendant's consent.

sat next to Nixon. In the third row there were three men, the defendant's friend, Azan Reid; Reid's cousin, Demarcus Kirkland; and a man known as "Kareem." Hughes did not know the defendant, but knew Reid.

Hughes drove down Brinsley Street and came to a stop at a sign at the intersection of Brinsley and Washington Streets. The victim, who had left the store, was walking on the sidewalk heading back to his automobile. People in the van called out the victim's name. The victim went over to the van, stuck his head inside the passenger side window, and then quickly backed up. As he backed away, the victim put his hands up and pulled up his shirt. The defendant opened the van's sliding door and repeatedly shot at the victim.[2] The victim stumbled and fell face down to the ground. The victim had been shot five times. Two of the shots hit the front of the victim: one shot entered his right, upper chest area, and the other entered his left lateral chest area. Another shot entered and exited the back of his left arm above the elbow. The other two shots were to the back: one shot entered the victim's back just above the right buttock and the other entered the back of his left thigh.

When the firing stopped, Reid instructed Hughes to "go" and she sped off, heading back to Mattapan. Britt left the victim's automobile and went over to him, as did others in the area, including the victim's friend, Keem Sinclair, who, in the company of his cousin, happened to be heading to the store. The victim was not breathing and there was blood underneath him. Sinclair's cousin left to get a police officer whom he knew was nearby.

---

[2]Two witnesses, Azan Reid and Chivona Hughes, identified the defendant as the shooter. Each witness testified pursuant to a plea agreement with the Commonwealth. At trial, Demarcus Kirkland testified that, although he heard shots coming from inside the van, he did not see who the shooter was because he had dropped "the weed" on the floor and was retrieving it. He acknowledged, however, a prior statement he made to police in October, 2002, that the defendant had been the shooter. (In his final charge to the jury, the judge correctly explained that a prior inconsistent statement of a witness is relevant only to the witness's credibility, see *Commonwealth* v. *West*, 312 Mass. 438, 440 [1942]; the judge offered to give a limiting instruction to this effect at the time of the testimony, but defense counsel declined, indicating she did not want to emphasize the testimony.) Steven Nixon testified that he was "passed out" at the time of the shooting. Nixon woke up when he heard shots, but did not see who was the shooter. No one else who had been inside the van testified.

Shortly thereafter several Boston police officers arrived at the scene. After finding that the victim had no pulse, an officer checked for weapons on the victim and found none. Paramedics arrived at 12:42 A.M. and transported the victim to a nearby hospital, where he was pronounced dead. The victim died as a result of multiple gunshot wounds.

Witnesses at the scene told police that a van had been present at the time of the shooting and had sped off just after. One witness, Sinclair's cousin, gave an officer a registration plate number, which was the registration plate number of Hughes's van. Over their radio, police issued a broadcast giving a description of the van. The police did not recover any ballistics evidence from the scene.

Hughes headed back to Mattapan and dropped off some of the occupants of the van at their homes. Shortly thereafter, the group met at Reid's home. Reid gave Hughes a bottle of window cleaner and instructed her to "wipe off the van." Reid told her that she would "be okay if [she] didn't say anything." In response to a question posed by Reid, the defendant remarked, "We got him." Hughes wiped down the van and left in it. She picked up two "crackheads" and then was pulled over, at about 3:30 A.M., by police officers on Evelyn Street in Mattapan. The officers took Hughes and the other two individuals back to a police station for questioning. Initially, Hughes lied to police because she "was scared for [her] life." Officers looked for ballistics evidence inside the van, but found none.

In an interview with police on August 5, 2002, Britt told police that the gunshots came from the van but that she did not see the shooter. She stated that she thought there had been four men in the back of the van and two in the front. One of the men in the back was a light-skinned African-American who was around seventeen or eighteen years of age and had braids.[3]

After she had been charged with being an accessory after the fact and spent two months in jail, Hughes met with police on October 9, 2002, and gave a statement in which she stated that the defendant was the shooter. Kirkland implicated the defendant

---

[3]The defendant's trial counsel brought out in cross-examination that Reid had shoulder-length braids and had the lightest skin color of those inside the van at the time of the shooting.

as the shooter in an interview with police on October 29, 2002. See note 2, *supra*. On that same day, Reid was arrested for being an accessory after the fact and gave a statement to police identifying the defendant as the shooter.[4] He had not spoken to police before because people are "not supposed to do things like that."

At trial, Reid testified that, on the day before the shooting, he saw the defendant with a revolver. The victim's mother testified that, during the spring and summer of 2002, she had been concerned about the people with whom the victim was spending his time. She also testified that, after the shooting, the defendant approached her and asked if she had heard anything about the victim's "case."

Nixon testified that he and his friends would "hang out" at Norfolk Park in Mattapan. He recalled an incident that took place in the summer of 2002 when he saw the victim drive up to Norfolk Park and repeatedly fire a weapon into the park area. Nixon also relayed another incident in February or March of 2002 where the victim (in the company of a friend) attempted to shoot him. Nixon provided this information to police when he was questioned on October 29, 2002.

A ballistics expert testified that the three spent bullets recovered from the victim's body during his autopsy had been fired from the same weapon. The weapon was not recovered.

The defendant did not testify, and no witnesses were called on his behalf. The defendant's trial counsel argued that the Commonwealth had not satisfied its burden of proving that the defendant was the shooter. She asserted that Hughes and Reid were untrustworthy witnesses, and intimated that Reid was the shooter.

2. *Unlawful carrying of a firearm in violation of G. L. c. 269, § 10 (a).* Because the defendant has not asserted or made any showing that he applied for a license under G. L. c. 140, § 131, to carry a firearm (and was denied[5]), we conclude that he may not challenge his conviction of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (*a*), under the Second

---

[4]No plea agreement had been offered at that time to Reid for his statements.

[5]The defendant's appellate counsel acknowledged during oral argument that, at the time of the shooting, the defendant had a prior felony conviction.

or Fourteenth Amendment. See *Commonwealth* v. *Powell,* 459 Mass. 572, 590 (2011).

3. *Motion for a new trial.* In his motion for a new trial, the defendant argued that his trial counsel furnished him with constitutionally ineffective representation in several instances and that reversible error occurred when the judge did not, on his own initiative, give certain instructions to the jury. With respect to his claims of ineffective assistance of trial counsel, because the defendant has been convicted of murder, "we examine these claims to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general constitutional standard for determining ineffective assistance of counsel." *Commonwealth* v. *Frank,* 433 Mass. 185, 187 (2001). Under this standard we consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* at 187-188, quoting *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992).

a. *Evidence of defendant's gang affiliation.* The defendant contends that his trial counsel and the judge erred in their treatment of the evidence of the *defendant's* gang affiliation. We first point out that there was no evidence at trial of the *defendant's* involvement in a gang. The prosecutor, however, in his opening statement, did suggest that *the victim* "had choices," including the choice of "the temptation of gang culture." This statement was intended to explain the expected motive evidence, which materialized. At trial, there was evidence concerning a possible motive for the victim's shooting, namely that the defendant was avenging the victim's attempted murder of Nixon.

"[I]n cases involving the introduction of evidence of gang affiliations, we have stressed that trial judges should take steps to minimize the prejudicial impact of this evidence." *Commonwealth* v. *Smith,* 450 Mass. 395, 400, cert. denied, 555 U.S. 893 (2008). These steps include "screen[ing] potential jurors during the empanelment process about their ability to hear gang-related evidence and remain impartial" and providing limiting instructions when such evidence is introduced at trial. *Id.*

Here, the motive evidence and other evidence at trial made no mention of any gang affiliations with respect to the defendant or the victim. Thus, there was no need for any limiting or curative instructions concerning the defendant's involvement in a gang. The prosecutor's reference to a gang pertained only to the victim and was an isolated remark. The judge instructed the jury that the opening statements and closing arguments of counsel are not evidence. Prior to trial, there was no indication that gang affiliation would be an issue in the case, thus warranting specific screening of prospective jurors on the matter. In the circumstances, there was no error by defense counsel or the judge, nor was there any occurrence of a substantial likelihood of a miscarriage of justice.

b. *Failure to introduce material exculpatory evidence.* On October 29, 2002, in a statement made to police, Kirkland recounted the shooting, stating that when the victim approached the van (before the shooting), he "looked in the window, he backed up and lifted up his shirt like he was about to pull out a gun." The defendant contends that his trial counsel was constitutionally ineffective because she did not cross-examine Kirkland at trial with this statement and did not introduce it as part of the defendant's case-in-chief. He argues that this evidence would have provided material support for his assertion of self-defense or defense of another. We disagree.

"Before a judge is required to give a requested instruction, there must be some basis in the evidence, viewed in the light most favorable to the proponent, supporting the requested instruction." *Commonwealth* v. *Cook*, 419 Mass. 192, 201 (1994), and cases cited. "If deadly force is used, a self-defense instruction must be given only if the evidence permits at least a reasonable doubt that the defendant reasonably and actually believed that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth* v. *Fisher*, 433 Mass. 340, 352 (2001), quoting *Commonwealth* v. *Hart*, 428 Mass. 614, 615 (1999). "For such a belief to be reasonable, the victim must have committed some overt act [assault or threat] against the defendant" and there must be some evidence that "the defendant availed himself of all means, proper and reasonable under the circumstances, of

retreating from the conflict before resorting to the use of deadly force." *Commonwealth* v. *Pike*, 428 Mass. 393, 396, 398 (1998). See *Commonwealth* v. *Glass*, 401 Mass. 799, 808 (1988) ("Self-defense is raised when there has been an overt act against the defendant constituting an assault or threat . . .").

Concerning Kirkland's statement to police in October, 2002, while he specified a gesture made by the victim (he "lifted up his shirt") and provided a speculative description of the gesture ("like he was about to pull out a gun"), he did not actually observe the presence of a gun or even of an object that may have been a gun. In fact, as the questioning of Kirkland continued, he made clear that he could not say whether he saw the victim with a gun, and acknowledged that he could not see through the tint of the windows of the van. Thus, in context, Kirkland's statement suggesting that the victim "was about to pull out a gun" was mere speculation, cf. *Commonwealth* v. *Hinds*, 457 Mass. 83, 89, 91 (2010) (male victim pushed his coat back with hand and defendant thought he had gun in belt or back pocket; no "reasonable person [would] have understood [the victim's] purported hand movements to suggest that [he] was reaching for a gun to shoot the defendant"), and would not have supported a self-defense or defense of another instruction, see *Commonwealth* v. *Fisher, supra.*

Further, the primary defense at trial was misidentification (that Reid had been the shooter), not self-defense. To raise a very weak self-defense claim, especially where Kirkland never identified the defendant as the shooter, would have diminished the primary defense theory at trial and would not have materially aided the defense. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

c. *Prosecutor's closing argument.* During his closing argument, the prosecutor stated that the defendant told Hughes to "wipe down" the van. The defendant asserts that the evidence showed only that Reid told Hughes to wipe down the van. Thus, the defendant argues that his trial counsel was ineffective for not objecting to this statement because it misstated the evidence. We reject the argument. Although Reid did testify that he told Hughes to wipe down the van, he also testified that, back at his house after the shooting, "everybody was saying" that they

"wanted their prints off of [the van]." "[E]verybody" included
the defendant. Even if there was no specific testimony that the
defendant, like Reid, directly told Hughes to wipe down the
van, the challenged remark qualified as a fair inference to be
drawn from the evidence and was not improper. See *Commonwealth* v. *Colon*, 449 Mass. 207, 224-225, cert. denied, 552
U.S. 1079 (2007) ("Arguments based on testimony submitted at
trial . . . are proper . . ."); *Commonwealth* v. *Guy*, 441 Mass.
96, 110 (2004) ("Prosecutors must limit the scope of their clos-
ing arguments to facts in evidence and the fair inferences that
may be drawn therefrom").

d. *Jury instructions.* The defendant argues that his trial counsel
was ineffective for failing to request jury instructions on self-
defense, defense of another, and voluntary manslaughter. He
further maintains that, based on the evidence, the judge, on his
own initiative, should have given these instructions. The defend-
ant contends that these instructions were warranted because the
evidence showed that the victim's conduct was "threatening" in
view of the fact that he purportedly gestured in a manner that
indicated that he was reaching for a firearm.

Here, in contending that he was in imminent danger of death
or serious bodily harm, the defendant relies on the trial testi-
mony of Kirkland, namely, that the victim looked like he was
about to "[r]each for something . . . [p]robably a gun." Kirk-
land, however, stated that this gesture by the victim occurred
*after* Kirkland heard shots. Kirkland did not see the actual
shooting because he had dropped his "weed" on the floor of the
van and was bent down retrieving it. All other accounts of the
shooting indicated that the unarmed victim, just before he repeat-
edly was shot, was backing away from the van and pulled up
his shirt and hands to show that he was not armed and did not
want any problems. There was no evidence of any overt act
made by the victim against the defendant or anyone else in the
van prior to the shooting. See *Commonwealth* v. *Glass, supra.*
Thus, there was no evidence permitting a self-defense instruc-
tion, and likewise no basis for an instruction on defense of
another or voluntary manslaughter. See *Commonwealth* v. *Tu
Trinh*, 458 Mass. 776, 783 (2011) (voluntary manslaughter instruc-
tion under theory of provocation not warranted where victim

unarmed and no evidence of action or combination of action and words on part of victim that reasonably would have provoked defendant to shoot victim); *Commonwealth* v. *Fisher, supra* at 353 (where defendant not entitled to instruction on self-defense, instruction on voluntary manslaughter based on use of excessive force in self-defense not required); *Commonwealth* v. *Monico*, 373 Mass. 298, 303 (1977) ("As is the case in the area of self-defense, there must be a threat of harm to the person being protected before its invocation as a defense in a criminal case is justified"). Consequently, there was no error in defense counsel's failure to request these instructions.

4. *G. L. c. 278, § 33E.* Pursuant to G. L. c. 278, § 33E, we also consider errors not raised by the defendant on appeal. We have stated that, with respect to the admission of death certificates, the better practice is to redact the manner of death, such as the words "homicide," "suicide," or "accident." *Commonwealth* v. *Ellis*, 373 Mass. 1, 8 (1977). Here, the manner of death was listed as "homicide" and was not redacted. No substantial likelihood of a miscarriage of justice resulted from the error. In his charge to the jury, the judge instructed that, under both theories of murder (deliberate premeditation and extreme atrocity or cruelty), the Commonwealth bore the burden of proving beyond a reasonable doubt that the defendant committed an unlawful killing. Further, the defendant did not dispute that the victim died as result of multiple gunshot wounds that were not self-inflicted. There is no basis for relief under G. L. c. 278, § 33E.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*