Commonwealth v. Gonzalez.

# COMMONWEALTH *vs.* LUIS GONZALEZ.[1]

Worcester. March 8, 2013. - July 9, 2013.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Voluntariness of statement. *Evidence,* Admissions and confessions, Voluntariness of statement, Self-defense, Intent. *Self-Defense. Intent. Practice, Criminal,* Capital case, Motion to suppress, Argument by prosecutor, Instructions to jury, Admissions and confessions, Voluntariness of statement.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements he made to police officers after he had been arrested but before he had received Miranda warnings, where a police officer's remark, made when detectives were by his side, that the detectives wanted to talk to the defendant was not the functional equivalent of express questioning, in that a reasonable person in the same circumstances as the defendant would not have perceived that he was then being subject to an interrogation or that the officers were trying to elicit incriminating responses from him. [675-676]

At a murder trial, the prosecutor, in closing argument, did not improperly vouch for certain witnesses [680-681]; further, the record supported the prosecutor's comments concerning the evidence of the stabbing, and while other comments were improper because witness credibility is a question for the jury to decide, the comments were isolated, and the judge correctly instructed the jury on this point [681-682]; finally, the prosecutor did not improperly shift the burden of proof to the defendant on the issue of self-defense, where the challenged remarks were a fair response to defense counsel's argument, and where, in any event, the defendant was not entitled to an instruction on self-defense [682-684].

At a murder trial, although the judge's instructions on voluntary manslaughter incorrectly stated the Commonwealth's burden of proof, failed adequately to explain the mutually exclusive relationship between malice (as required for a murder conviction) and sudden passion induced by reasonable provocation or sudden combat, and were incomplete and erroneous on the use of excessive force in self-defense, no substantial likelihood of a miscarriage of justice arose from the errors, where the defendant was not entitled to instructions on voluntary manslaughter, in that there was no evidence of provocation by the victim or sudden combat; and where, in light of this court's conclusion that the defendant was not entitled to an instruction on self-defense, an instruction on voluntary manslaughter based on the use of excessive force in self-defense also was not required. [684-688]

[1] As is our custom, we spell the defendant's name as it appears in the indictment. *Commonwealth* v. *Rodriquez,* 461 Mass. 100, 100 n.1 (2011).

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a conviction of murder in the first degree or to order a new trial. [688]

INDICTMENT found and returned in the Superior Court Department on May 3, 2005.

A pretrial motion to suppress evidence was heard by *Janet Kenton-Walker*, J., and the case was tried before *John S. McCann*, J.

*Jeffrey L. Baler* for the defendant.

*Jane A. Sullivan*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On March 9, 2010, a jury convicted the defendant, Luis Gonzalez, of murder in the first degree on the theory of deliberate premeditation. Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress statements, (2) the prosecutor's closing argument, and (3) the judge's instructions to the jury. The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We affirm the order denying the defendant's motion to suppress as well as the defendant's conviction, and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Motion to suppress statements.* a. *Background and standard of review.* Prior to trial, the defendant moved to suppress statements he made to police after he was arrested, but before he received the Miranda warnings. As relevant here, the defendant argued that his statements were not preceded by a knowing, intelligent, and voluntary waiver of his Miranda rights in violation of the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. After conducting an evidentiary hearing, the motion judge[2] denied the motion. The judge concluded that the defendant's statements were not the result of police interrogation, but rather were spontaneous and unprovoked and that, therefore, the lack of preceding Miranda warnings did not violate the defendant's constitutional rights. The judge also found, beyond a reasonable doubt, that the defendant's statements had been voluntary.

---

[2]The motion judge was not the trial judge.

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [the judge's] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), and cases cited.

Based on evidence identifying the defendant as the person who had stabbed the victim earlier that evening, Sergeant Mark Richardson of the Worcester police department, who was in charge of the investigation, went, near midnight on February 28, 2005, to join other officers at the defendant's last known address at an apartment in Worcester. Prior to Sergeant Richardson's arrival, other officers had observed a man fitting the defendant's description enter the apartment. The defendant was apprehended there and was arrested. He told officers, "You've got me." He did not appear to have any physical injuries, and was not unsteady on his feet.

The defendant was transported to a police station and placed in a holding cell. At around 2:30 A.M., now March 1, Officer Danny D. Diaz was asked by Detectives Mark Sawyer and Eric Boss to bring the defendant to the detective bureau for an interview. Accompanied by the detectives, Officer Diaz, first in English and then in Spanish, identified himself and told the defendant that he was going to bring him upstairs.[3] The detectives joined them. While approaching an elevator, Officer Diaz told the defendant, in Spanish, that the detectives wished to speak with him about an incident. The defendant stated that he wanted to talk to someone about it. Officer Diaz interrupted, telling the defendant that "right now's not the time to talk" and eventually there would be an opportunity to talk.

Inside the elevator, the defendant stated that he was "only

---

[3] The defendant had difficulty speaking English. Having been raised by Spanish-speaking parents and having studied the language in his youth, Officer Danny D. Diaz was fluent in Spanish. As part of his job with the police department, he had often assisted in translating for Spanish-speaking prisoners and civilians.

defending himself." Officer Diaz again advised the defendant that it was not the time to talk and relayed that they would talk after certain procedures had been completed. The defendant stated that he was "jumped" and that he only had been "defending himself." At least three or four times, Officer Diaz told the defendant that it was not the time to talk. The defendant nevertheless continued, crying at times and telling Officer Diaz that he wanted to talk to someone about the incident, that he had not wanted to hurt anyone, and that he only had been defending himself. To Officer Diaz, the defendant appeared nervous and scared.

After the defendant was fingerprinted, Officer Diaz brought him to an interview room. There, Officer Diaz, using a preprinted card, advised the defendant of the Miranda warnings, both in English and in Spanish. The defendant signed the Miranda warning card and then asked for a lawyer. All questioning ended.

b. *Discussion.* The defendant argues on appeal that Miranda warnings were required because Officer Diaz's remark, made when the detectives were by his side, that they wanted to talk to him, was the "functional equivalent" of express questioning. "Miranda warnings are only necessary where one is the subject of 'custody and official interrogation.' " *Commonwealth* v. *Larkin,* 429 Mass. 426, 432 (1999), quoting *Illinois* v. *Perkins,* 496 U.S. 292, 297 (1990). "For the purposes of *Miranda,* 'interrogation' means not only express questioning of a suspect but also its 'functional equivalent.' " *Commonwealth* v. *D'Entremont,* 36 Mass. App. Ct. 474, 478 (1994), quoting *Rhode Island* v. *Innis,* 446 U.S. 291, 301 (1980). The term "functional equivalent" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis, supra.* "In this context, an 'incriminating response' includes any response, inculpatory or exculpatory, which the prosecution might seek to use against the suspect at trial." *Commonwealth* v. *Torres,* 424 Mass. 792, 797 (1997). "The 'functional equivalence' test does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interroga-

tion by a reasonable person in the same circumstances." *Id.*, quoting *United States* v. *Taylor*, 985 F.2d 3, 7 (1st Cir.), cert. denied, 508 U.S. 944 (1993).

The judge correctly concluded that the defendant's statements were not the result of police interrogation or its functional equivalent. Officer Diaz informed the defendant that he was there to transport him to a different location and that the detectives (not Officer Diaz, himself) wished to speak to him about an incident. In response, when the defendant stated that he wanted to talk to someone, Officer Diaz interrupted him and told him clearly and unequivocally that now was not the time to talk. Neither Officer Diaz nor the detectives expressly asked any questions of the defendant. Any uncertainty (possibly resulting from the unnecessary presence of Detectives Boss and Sawyer during the transport of the defendant)[4] concerning when it would be appropriate for the defendant to talk was made clear by Officer Diaz — "right now's not the time to talk." A reasonable person in the same circumstances as the defendant would not have perceived that he was then being subject to an interrogation or that the officers were trying to elicit incriminating responses from him. The defendant's statements thereafter were voluntary and not made as a result of any police prompting or coercion. Indeed, Officer Diaz repeatedly and expressly instructed the defendant that it was not the time to talk. While the standard to evaluate whether the functional equivalent of an interrogation had occurred focuses on the perceptions of a reasonable person in the same circumstances as the suspect, see *Commonwealth* v. *Torres, supra*, the defendant cannot parse out one police remark and ignore the rest of the record. There was no error.

*2. Trial.* As an initial matter, the defendant did not contest that he stabbed and killed the victim during an argument. The main issues at trial were whether the defendant acted with the requisite intent to commit murder, whether certain circumstances mitigated the murder to manslaughter, and whether the killing was excused because he had acted in proper self-defense.

*a. The Commonwealth's case.* We summarize the facts the

---

[4]Had the defendant received the Miranda warnings earlier, such as at the time of his arrest, his perceptions concerning when and whether he wanted to talk to police may have been informed and obviated what later transpired.

jury could have found, reserving certain details for discussion in conjunction with the specific issues raised. On February 28, 2005, the victim lived with her two young children in a five-bedroom apartment in Worcester. Three other adults also lived in the apartment and paid rent to the victim: Taina Diaz, Adolfo Acevedo (Adolfo),[5,6] and the defendant.

At about 9 P.M., on February 28, 2005, Diaz returned home to find the defendant in the kitchen drinking a "forty," which is a forty-ounce can of beer, and playing loud music. He turned up the volume when she asked him to lower it, so she took her radio away from him and knocked over his beer. The defendant went to the liquor store. When he returned, he and Diaz bickered about his refusal to remove his shoes while inside.

The victim arrived home at approximately 9:30 P.M. Diaz told the victim what had occurred between her and the defendant. The victim and the defendant started arguing in the kitchen. The victim's friend, Yasaira, who was Adolfo's sister and had been watching the victim's children, heard the victim and the defendant arguing. Both Diaz and Yasaira saw the defendant push the victim. Diaz told the defendant to "get off" the victim. Yasaira told the defendant to stop, but he "kept trying to put hands on [the victim]." Yasaira asked a friend, Katie Simpson, to contact Adolfo. She did, and he arrived around ten to fifteen minutes later, followed by Theresa DeJesus, who was the victim's friend, and Dory Rodriguez.

DeJesus and Rodriguez did not go directly into the kitchen, but they heard arguing there. Adolfo went into the kitchen and observed the defendant pushing the victim. He told the defendant to get off the victim, then punched the defendant in the face, giving him a bloody lip. The defendant punched back, and the two men, both punching, fell to the floor, with Adolfo landing on top of the defendant.

Diaz and Yasaira pulled Adolfo away from the defendant. Diaz told Adolfo to calm down and asked him to leave. Adolfo went to the defendant's bedroom, gathered the defendant's clothes, and then threw them on the kitchen floor. He told the

[5]We will refer to some witnesses by their first names.

[6]Adolfo is the paternal uncle of the victim's children.

defendant, "You don't hit females." In Spanish, the defendant apologized. Yasaira gave the defendant a cloth to wipe his lip. Adolfo and the victim each told the defendant to leave. Adolfo said he would be back soon, and threatened to telephone the police if the defendant had not left by the time he returned. The defendant stated that he would leave. Adolfo departed.

The victim remained in the kitchen, sitting in her daughter's highchair. While drinking a "forty," the defendant began placing his strewn clothing into bags. He started to argue with the victim again; DeJesus and Rodriguez told her not to argue with him. The defendant went to his room. Looking at himself in the mirror, the defendant cried, "Look at my face," and broke the mirror.

The defendant returned to the kitchen,[7] and the victim said something about rent money. DeJesus testified that she saw the defendant turn to the victim and pull out a knife. He asked the victim, "Do you want me to kill you?" The victim told him he was crazy and asked what was wrong with him. DeJesus was scared, ran out of the building, and telephoned 911.[8]

Rodriguez recalled that, before the defendant went to his room, he called the victim a "whore." When the defendant returned to the kitchen, the victim said, "Let's see who's an asshole." The defendant pulled out a "big" knife and stabbed the victim in the middle of her chest while she was sitting in the highchair. Rodriguez ran out of the apartment.

Yasaira testified that she was leaving the apartment when she heard the victim scream. When she returned to the threshold of the kitchen, the victim put out her arms and took hold of her. Yasaira held the victim; they faced each other. The defendant was behind the victim, holding a shiny object that he pulled out of the victim. Yasaira fell to the floor, with the victim falling on top of her. Yasaira told the victim to run. Yasaira got up, and the defendant stood in front of her holding a "big kitchen" knife. She, as well as the victim, ran to the living room. Yasaira

---

[7]Regarding the duration of time between Adolfo's leaving the apartment and the defendant's returning to the kitchen after having gone to his room, one witness testified that twenty to thirty minutes might have elapsed, while another testified it was approximately ten minutes.

[8]Police were dispatched to the victim's apartment at about 10:20 P.M.

saw the defendant, with the knife in his hand, run out the back door.

Diaz testified that, after DeJesus ran by her room, she went to the kitchen. The defendant was holding a big "kitchen" knife, about twelve inches long, by his shoulder and the victim was on the floor on top of Yasaira. The knife had something red on it. Diaz went to her room and returned with a bottle. She saw the defendant "come up from stabbing" the victim. She told him to leave and threw the bottle at him as he ran to a door.

The victim suffered two stab wounds, one to her left upper chest and one to her right midback near her shoulder blade, and a superficial exterior wound and superficial cut to one of the fingers of her right hand. She died as a result of the stab wound to her chest, which severed a vein and punctured her lung.

Sometime after the defendant ran out of the apartment, around 10:30 P.M., he approached a man who was clearing snow from his automobile and demanded that the man "take [him] out of here." The defendant stated, "They want to kill [or beat] me." The man started driving and asked what had happened. Initially, the defendant said he had been in a fight, but then he said he had "stabbed a lady" and did not want to go to jail. The defendant had the man drive by the victim's apartment, saying that he had left his wallet and papers there, but then asked the man to drive him to New York. The man refused, but agreed to take the defendant to a bus station. During their time together the defendant stated, "I killed that bitch" and "I think she's dead." Before midnight, police officers apprehended and arrested the defendant at a former address.

The defendant was transported to a Worcester police station. While there he made several incriminating statements to Officer Diaz that were the subject of a motion to suppress, discussed previously. Because Officer Diaz's trial testimony was substantially similar to his testimony at the evidentiary hearing on the motion to suppress, it does nor bear repeating here. At his booking, the defendant repeatedly asked God for forgiveness, whether "the girl was ok," and whether he had killed her.

The police did not recover the murder weapon. A folding knife, on which there was no blood and which did not match

the description of the knife used by the defendant, was recovered on the kitchen floor of the victim's apartment. See note 9, *infra*.

b. *The defendant's case.* The defendant did not testify. During the cross-examination of Adolfo, defense counsel unsuccessfully tried to elicit evidence that other witnesses or the victim had been physical with the defendant. The defendant presented one witness, a Spanish-speaking federally certified court interpreter, who had reviewed the recording of the defendant's booking. She testified that, when he was booked, the defendant never asked for forgiveness, denied killing anyone, and stated, "I have to apologize to somebody." In his closing argument, defense counsel argued that the defendant's consumption of alcohol bore on his mental state such that he lacked the requisite intent to kill, that the police investigation was inadequate, and that the defendant properly acted in self-defense.

3. *Prosecutor's closing argument.* The defendant argues that several remarks made by the prosecutor in his closing argument were improper, possibly made a difference in the verdict, and effectively denied him a fair trial. Because he did not object to these comments at trial, we "examine whether anything said by the prosecutor was improper and, if so, whether the impropriety created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Frank*, 433 Mass. 185, 195 (2001), and cases cited. "Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Commonwealth* v. *Whitman*, 453 Mass. 331, 343 (2009). Both before the opening statements and after the closing arguments of counsel, the judge instructed the jury that the opening statements and closing arguments of counsel are not evidence.

a. We reject the defendant's contention that the prosecutor improperly vouched for Diaz, DeJesus, Rodriguez, and Yasaira in stating: "Why are the police going to do a blood spatter analysis when you've got four eyewitnesses? There's nothing better than four eyewitnesses." The remarks must be viewed in context, and in so doing the prosecutor did not express a personal belief in the credibility of these witnesses or imply that he had any knowledge independent of the evidence verifying their testimony. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265

(1989). Rather, the remarks were a proper response to defense counsel's argument and suggestion to Sergeant Richardson made during his cross-examination that the police investigation, and specifically the failure of police to conduct blood spatter testing, was inadequate. See *Commonwealth* v. *Anderson*, 411 Mass. 279, 286 (1991). There was no error.

b. The defendant contends that the prosecutor misstated the law when he stated:

> "It's 'You know, we want you to accept that [the defendant] acted in self-defense; and if you don't buy the self-defense, well, maybe you'll buy that he was drunk; and if you don't buy that he was drunk, well, maybe you'll accept this.' You know, pick one. It doesn't work that way. You've got four people who saw him stabbing [the victim] or the immediate aftermath of him stabbing her. You can't have it both ways. You can't say, 'I want you to accept this, but don't accept this from the witness.' It doesn't work that way."

The prosecutor's comments in this challenged passage concerning the evidence of the stabbing is supported by the record. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Also, the prosecutor was correct in pointing out to the jury that the defendant was arguing multiple alternative defenses and properly commented that the defense "can't have it both ways." See *Commonwealth* v. *Hoilett*, 430 Mass. 369, 375 (1999).

The final challenged remarks ("You can't have it both ways. You can't say, 'I want you to accept this, but don't accept this from the witness.' It doesn't work that way") were improper because "[witness] [c]redibility is a question for the jury to decide; they may accept or reject, in whole or in part, the testimony presented to them." *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 (1978). The prosecutor's comments, however, were isolated, and the judge correctly instructed the jury in accordance with this law and, as previously noted, instructed the jury that the closing arguments of counsel are not evidence, and that they are required to apply the law as given to them by him. The jury are presumed to follow his instructions. See *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990), and cases cited.

In the circumstances, no substantial likelihood of a miscarriage of justice occurred. See *Commonwealth* v. *Frank, supra.*

c. The defendant argues that, in his closing argument, the prosecutor misstated the law and improperly shifted the burden of proof on the issue of self-defense. In context, the prosecutor was not purporting to state the law, but was arguing that the facts in evidence and the fair inferences therefrom called for rejecting the defendant's claim that he was entitled to act in self-defense. This was proper. See *Commonwealth* v. *Kozec, supra.* Further, the remarks were a fair response to defense counsel's argument that the defendant appropriately exercised self-defense. See *Commonwealth* v. *Anderson, supra.* Viewed in context with the judge's correct instructions to the jury that the Commonwealth bore the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, and that, if the Commonwealth failed to meet this burden, the jury must find the defendant not guilty, see *Commonwealth* v. *King,* 460 Mass. 80, 83 (2011), the challenged remarks, even if questionable in any sense, did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Whitman, supra* at 345.

Regardless, we conclude (which has significance later) that, on this record, the defendant was not entitled to an instruction on self-defense. "A defendant is entitled to have the jury at his trial instructed on the law relating to self-defense if the evidence, viewed in its light most favorable to him, is sufficient to raise the issue." *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980). "When deadly force is used, as the defendant did here by stabbing the victim . . . a defendant is entitled to an instruction on self-defense where there is 'evidence warranting at least a reasonable doubt' that he '(1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case.' " *Commonwealth* v. *Harris,* 464 Mass. 425, 432 (2013), quoting *Commonwealth* v. *Pring-Wilson,* 448 Mass. 718, 733 (2007). See *Commonwealth* v. *Harrington, supra.* "For [a defendant's] belief to be reason-

able, the victim must have committed some overt act [assault or threat] against the defendant . . . ." *Commonwealth* v. *Pike*, 428 Mass. 393, 396, 398 (1998). See *Commonwealth* v. *Glass*, 401 Mass. 799, 808 (1988) ("Self-defense is raised when there has been an overt act against the defendant constituting an assault or threat . . .").

The defendant did not testify at trial; thus, we examine his statements to police and any other relevant evidence. See *Commonwealth* v. *Benoit*, 452 Mass. 212, 227 (2008). See also *Commonwealth* v. *Burbank*, 388 Mass. 789, 794-795 (1983) (if hearsay is admitted without objection, statements may be considered substantively in determining whether defendant had right to defend himself with deadly weapon). The defendant claims that an instruction on self-defense was warranted because of evidence that he told police that he had only been "defending himself" from the group who wanted to kill him, that the victim was part of this group, and that he only "lashed out during a beating in order to escape."[9] The defendant's characterization of the import of this evidence in the record is skewed.

While the defendant did tell police that he had been "jumped" and had only been "defending himself," and told the man who took him to a bus station that "they" wanted to "kill" or "beat" him,[10] there was no evidence that anyone other than Adolfo had been physical with the defendant, and there was no evidence identifying whom the defendant meant by "they." To the extent that the defendant suggests that the victim was part of this "group," the record establishes only that she, along with others, had been present in the kitchen when Adolfo hit the defendant before the stabbing. This "evidence" is not sufficient to infer her participation in an alleged group beating of the defendant. There was no evidence of that. To allow such an unsupported and attenuated inference would essentially permit sheer specula-

[9]During oral argument, appellate counsel argued that the presence of a folding knife found by police in the victim's kitchen demonstrates that there is "more to the story" than what appears in the record. We are, however, limited to the record, and we note that there was no evidence concerning any use or display of that particular knife (which differed in description from the one used to kill the victim). Its existence adds nothing of significance for either party.

[10]The defendant soon changed his story to this man, admitting that he had "stabbed a lady" and thought he had "killed that bitch."

tion to serve as a basis for a self-defense instruction, which we have not allowed. See *Commonwealth* v. *Wallace*, 460 Mass. 118, 125 (2011) (witness's suggestion that victim may have possessed gun and gestured, where witness admitted to not being able to see through tinted window of van in which witness was riding, amounted to "mere speculation" that did not support self-defense instruction).

Further, there is no evidence that raised a reasonable doubt that the defendant could not have avoided physical combat with the victim or was unable to retreat. See *Commonwealth* v. *Rodriquez*, 461 Mass. 100, 110 (2011); *Commonwealth* v. *Benoit*, *supra*. Adolfo left the apartment after the fight with the defendant. There was undisputed evidence that after Adolfo left, the defendant walked out of the kitchen and went into his bedroom before returning to the kitchen and stabbing the victim. When the defendant had stabbed the victim, some time (according to some witnesses, ten to twenty minutes, see note 7, *supra*) had passed since Adolfo's departure. The defendant overlooks this evidence, arguing instead that he had to stab the victim "in order to avoid a continued beating." The record, viewed in the light most favorable to him, belies his contention; there was no evidence of a present threat or overt act from the victim at the time the defendant stabbed her. The judge should not have instructed the jury on self-defense.[11] See *Commonwealth* v. *Rodriquez*, *supra* (evidence insufficient to entitle defendant to self-defense instruction; although victim walked "hastily" toward defendant, such movement could not be construed as initiating confrontation or actual combat); *Commonwealth* v. *Espada*, 450 Mass. 687, 693-694 (2008) (defendant not entitled to self-defense instruction where, viewed in light most favorable to defendant, assault had occurred well before shooting and no evidence was offered of assault or threat at time of shooting; defendant could have retreated or attempted to retreat).

4. *Jury instructions.* Because the defendant did not object to the jury instructions on the grounds he now asserts, "we review

[11]During a charge conference the prosecutor vigorously had argued that there was no evidence of self-defense. Instead of telling the jury that there was evidence of self-defense, the judge decided instead to tell them that there was "a claim" of self-defense (and later did present it in those terms).

the challenged instructions to determine whether they contain error, and if so whether there is a 'substantial likelihood that a miscarriage of justice occurred.' " *Commonwealth* v. *Fickling*, 434 Mass. 9, 17-18 (2001), quoting *Commonwealth* v. *Vinton*, 432 Mass. 180, 188 (2000). We agree with the defendant, and the Commonwealth concedes, that the instructions on voluntary manslaughter incorrectly stated the Commonwealth's burden of proof and failed adequately to explain the mutually exclusive relationship between malice, as required for a murder conviction, and sudden passion induced by reasonable provocation or sudden combat, which mitigates murder to voluntary manslaughter. See *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715-716 (1998); *Commonwealth* v. *Boucher*, 403 Mass. 659, 661-662 (1989). Also, the instruction on the use of excessive force in self-defense was incomplete and erroneously told the jury that they could not return a verdict of involuntary manslaughter unless the Commonwealth proved beyond a reasonable doubt that the defendant used excessive force in defense of himself. See *Commonwealth* v. *Johnson*, 461 Mass. 1, 4-5 (2011) (Gants, J., concurring), citing *Commonwealth* v. *Acevedo, supra* at 716. See also *Commonwealth* v. *Glacken*, 451 Mass. 163, 167 (2008) (to prove defendant guilty of murder, Commonwealth is required to prove beyond reasonable doubt that defendant did not act in proper exercise of self-defense; if Commonwealth proves that defendant did not act in proper self-defense *solely* because defendant used more force than was reasonably necessary, then Commonwealth has not proved that defendant committed crime of murder, but if Commonwealth has proved other required elements [that defendant did not act in proper self-defense], then jury shall find defendant guilty of voluntary manslaughter); *Commonwealth* v. *Johnson*, 412 Mass. 368, 373 (1992), and cases cited (instruction on excessive force in self-defense must inform jury that they must find defendant guilty of voluntary manslaughter, not murder, where defendant had right to use force in self-defense, but used excessive force). We conclude, however, that in the circumstances of this case, there was no substantial likelihood of a miscarriage of justice arising from the errors in the instructions.

First, the defendant was not entitled to voluntary manslaughter

instructions based on any of the three theories. "Voluntary manslaughter is an unlawful killing 'arising not from malice, but from . . . sudden [heat of] passion induced by reasonable provocation, sudden combat, or [the use of] excessive force in self-defense.' " *Commonwealth* v. *Acevedo*, 446 Mass. 435, 443 (2006), quoting *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990). Here, no voluntary manslaughter instruction based on reasonable provocation was warranted because there was no evidence of provocation by the victim. See *Commonwealth* v. *Hinds*, 457 Mass. 83, 90-91 (2010), quoting *Commonwealth* v. *Ruiz*, 442 Mass. 826, 838-839 (2004) ("provocation must come from the victim"). While there was evidence (testimony of Rodriguez) that the victim said, "Let's see who's an asshole," before the defendant stabbed her, we have stated that mere words, no matter how insulting or abusive, do not by themselves constitute reasonable provocation. See *Commonwealth* v. *Mercado*, 452 Mass. 662, 672 (2008). The defendant's claim that the victim was part of the group who had "jumped" him, as explained above, is mere speculation. Contrast *Commonwealth* v. *Acevedo*, *supra* at 444 & n.13 (instruction regarding voluntary manslaughter on reasonable provocation warranted where evidence existed not only that victim was part of group who charged and beat defendant immediately before stabbing, but also that two witnesses saw victim twice strike defendant). For these same reasons, the evidence did not warrant a voluntary manslaughter instruction on the basis of sudden combat. See *Commonwealth* v. *Espada*, *supra* at 696-697, quoting *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 822 (2006) ("for sudden combat to be the basis of a voluntary manslaughter instruction, the 'victim . . . must attack the defendant or at least strike a blow against the defendant' ").

Further, under both theories, a voluntary manslaughter instruction is not warranted where the defendant " 'cooled off' and 'regained a measure of self-control' before attacking the victim." *Commonwealth* v. *Barbosa*, 463 Mass. 116, 136 (2012), quoting *Commonwealth* v. *Smith*, 460 Mass. 318, 325-326 (2011). See *Commonwealth* v. *Acevedo*, *supra* at 443 ("jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the

homicide, and that in fact a defendant was provoked and did not cool off"). "[O]ur case law is clear that where the alleged provocation is followed by at least a few minutes during which the defendant and the victim are separated, and then the defendant seeks out the victim, a charge of voluntary manslaughter based on provocation is not warranted." *Commonwealth* v. *Barbosa, supra* at 136-137, quoting *Commonwealth* v. *Colon,* 449 Mass. 207, 221, cert. denied, 552 U.S. 1079 (2007), and cases cited. Here, the defendant's statements to police and to the man who drove him to a bus station did not speak to any sequence or timing of events. There was no evidence to contradict the evidence establishing the following. Adolfo had left the apartment, and the physical attack on the defendant had ended before the stabbing. After Adolfo left, the defendant packed some of his clothing in the kitchen and then went to his bedroom, where he was alone. After he broke the mirror in his bedroom, the defendant returned to the kitchen and stabbed the victim. Where the physical altercation had ended, in conjunction with the passage of time demonstrated by the defendant's actions of packing some clothing and going to his room before returning to the kitchen, no reasonable person would have remained provoked and not have "cooled off" at the time of the stabbing. *Commonwealth* v. *Barbosa, supra* at 137. Cf. *Commonwealth* v. *Acevedo, supra* at 444 n.13 (reasonable provocation instruction warranted where there was evidence that group charged and beat defendant "immediately" before stabbing).

We add, in view of our earlier conclusion that the defendant was not entitled to an instruction on self-defense, that "an instruction on voluntary manslaughter based on the use of excessive force in self-defense was also not required." *Commonwealth* v. *Fisher,* 433 Mass. 340, 353 (2001), citing *Commonwealth* v. *Carrion,* 407 Mass. 263, 268 (1990). See *Commonwealth* v. *Wallace,* 460 Mass. 118, 126-127 (2011), and cases cited.

As we explained, the defendant was not entitled to instructions on voluntary manslaughter. Thus, any errors in the voluntary manslaughter instructions, and in the instructions that allegedly "prevented the jury from considering manslaughter," did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Clemente,* 452 Mass. 295, 321 (2008), cert.

denied, 555 U.S. 1181 (2009) (no prejudice to defendant from error in voluntary manslaughter instruction where defendant was not entitled to such instruction and received "more protection than the law afforded him"). Because the defendant's claims of error concerning the jury instructions do not create a substantial likelihood of a miscarriage of justice, these same claims cannot be the basis for a determination of ineffective assistance of trial counsel. See *Commonwealth* v. *Silva*, 455 Mass. 503, 528 (2009).

5. *Relief pursuant to G. L. c. 278, § 33E.* Pursuant to our duty under G. L. c. 278, § 33E, we also consider errors not raised by the defendant on appeal. The medical examiner should not have been allowed to testify that the "manner" of the victim's death was a "homicide." See *Commonwealth* v. *Wallace, supra* at 127, citing *Commonwealth* v. *Ellis*, 373 Mass. 1, 8 (1977). See also *Commonwealth* v. *Lannon*, 364 Mass. 480, 484 (1974). There was no dispute, however, in this case that the victim died as a result of a stabbing that the defendant had committed. There is no basis for relief under G. L. c. 278, § 33E.

*Judgment affirmed.*